No. 23-2605

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

KENNETH MOSES,

Plaintiff-Appellant,

v.

UNITED STATES STEEL CORPORATION,

Defendant-Appellee.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:20-cv-00752-WSS
Hon. William S. Stickman IV

_____

## APPELLANT KENNETH MOSES'S OPENING BRIEF

_____

Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Hugh T. McKeegan
hugh.mckeegan@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
Tel:   (412) 566-1500

*Attorneys for Appellant*
*Kenneth Moses*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ................................................4

    A.    The Basis for the District Court's Jurisdiction.....................4

    B.    The Basis for this Court's Jurisdiction.................................4

    C.    The Filing Dates Establishing the Timeliness of the Appeal...............4

    D.    This Appeal Is from a Final Order or Judgment ...................4

ISSUES PRESENTED....................................................................5

STATEMENT OF RELATED CASES ...........................................6

STATEMENT OF THE CASE.......................................................6

SUMMARY OF THE ARGUMENT ............................................17

ARGUMENT ..............................................................................19

    I.    Standard of Review ............................................................19

    II.    Moses's evidence, which must be taken as true, establishes a direct and unbroken causal link between his supervisor's bias and Defendant's decision to fire him. ....................................24

        A.    Moses presented a much stronger causal connect than the district court's analysis suggests...........................26

            i.    Moses's evidence shows a racially biased atmosphere permeated his workplace. ...............................27

            ii.    Moses's evidence allows a reasonable factfinder to draw a clear inference of disparate treatment..........................29

            iii.    The inference that must be drawn at summary judgment is that supervisor bias was a but-for cause of Moses's termination. ....................................32

        B.    Moses's evidence is sufficient to establish subordinate bias/cat's paw liability. ........................................34

    III.    Moses presented sufficient evidence to establish pretext.........................37

A.    To demonstrate pretext, a plaintiff need only present sufficient evidence from which a reasonably jury could disbelieve the employer's proffered explanation. .............................................38

B.    Moses presented sufficient evidence to raise genuine disputes of material fact as to pretext.......................................................41

CONCLUSION ..................................................................................................45

COMBINED CERTIFICATION OF COMPLIANCE...........................................46

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986)............................................20

*Anderson v. Potter,* 723 F. Supp. 2d 368 (D. Mass. 2010)......................................23

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3d Cir. 2010).......................26

*Andrews v. Philadelphia,* 895 F.2d 1469 (3d Cir. 1990).................................. 21, 39

*Barnes v. Nationwide Mut. Ins. Co*., 598 Fed. App'x 86 (3d Cir. 2015)................27

*Big Apple BMW, Inc. v. BMW of N. Am., Inc*., 974 F.2d 1358 (3d Cir. 1992) . 20, 21

*Bostock v. Clayton Cty.,* 140 S.Ct. 1731 (2020) ......................................................36

*Brown v. J. Kaz, Inc.,* 581 F.3d 175 (3d Cir. 2009)..................................................25

*Burton v. Teleflex Inc.*, 707 F.3d 417 (3d Cir. 2013).................................. 19, 20, 22

*Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340 (3d Cir. 2022) ............. 19, 20

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009

    (2020)..................................................................................................................24

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016)......................... 25, 26

*Covell v. Bell,* 651 F.3d 357 (3d Cir. 2011)..............................................................23

*Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358 (3d Cir. 2008) ........................................26

*Doe v. Luzere Cnty.*, 660 F.3d 169 (3d Cir. 2011)...................................................22

*Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992) ........31

*Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005) ......................................... 41, 43, 44

*Goosby v. Johnson & Johnson Medical Inc.*, 228 F.3d 313 (3d Cir. 2000) ............12

*Hill v. City of Scranton*, 411 F.3d 188 (3d Cir. 2005) ............................................22

*Jones v. S.E. Pa. Transp. Auth*, 796 F.3d 323 (3d Cir. 2015)..................................38

*Jones v. School Dist.,* 198 F.3d 403 (3d Cir. 1999) .......................................... 42, 43

*Kelly v. U.S. Steel Corp.*, 2:11-cv-00193, 2012 U.S. Dist. LEXIS 107475 (W.D.

   Pa. Aug 1, 2012) ..................................................................................................22

*Laruen W. v. DeFalminis*, 480 F.3d 259 (3d Cir. 2007)................................... 22, 23

*Marcus v. PQ Corp.*, 458 Fed. App'x 207 (3d Cir. 2012)........................................38

*Matsushita Elec. Industrial co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ........21

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................26

*McKenna v. City of Phila.,* 649 F.3d 171 (3d Cir. 2011)........................................38

*O'Connor v. Cons. Coin Caterers Corp.*, 517 U.S. 308 (1996) ..............................27

*Pivirotto v. Innovative Sys.,* 191 F.3d 344 (3d Cir. 1999) ......................................27

*Razak v. Uber Techs., Inc.*, 951 F.3d 137 (3d Cir. 2020) .......................................20

*Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133 (2000).................... 21, 22, 41

*Sarullo v. United States Postal Serv.*, 352 F.3d 789 (3d Cir. 2003).......................27

*Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486 (3d Cir. 1999) ...........................25

*Simmons v. Sykes Enters., Inc.*, 647 F.3d 943 (10th Cir. 2011) .............................38

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) .................................................. 37, 38

*Sterrett v. Giant Eagle, Inc.*, 681 Fed. App'x 145 (3d Cir. 2017)...........................38

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ...............................26

*Walden v. Ga.-Pacific Corp.*, 126 F.3d 506 (3d Cir. 1997) ....................................30

**Statutes**

28 U.S.C. § 1291 ...........................................................................................................4

28 U.S.C. § 1331 ...........................................................................................................4

28 U.S.C. § 1367 ...........................................................................................................4

42 U.S.C. § 1981 ...........................................................................................................4

43 P.S. § 955 .................................................................................................................4

**Other Authorities**

3d Cir. I.O.P. 9.1 (2023) ............................................................................................23

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................19

**INTRODUCTION**

At their core, Moses's claims under Section 1981 and the PHRA assert that he was discriminated against by his supervisors at United States Steel because of his race (black) and that he ultimately lost his job because of this treatment. The evidence here shows that, time and again—and despite facially neutral policies— USS supervisors initiated disciplinary action against Moses for infractions that, when committed by white employees, received little or no sanction at all. And, when USS's HR personnel meted out punishment, Moses appears to have always received the maximum, while his white coworkers received minimal sanctions.

This pattern is especially evident in USS's treatment of safety violations. According to USS, "given USS's commitment to protecting its employees and the community, safety infractions are *always* penalized with a five-day suspension subject to discharge." However, the record shows this was not the case. For example, when Moses was cited for the "unsafe act" of not promptly faxing a report, his white coworker Adam O'Neill reported never receiving more than a warning for the same oversight. While Moses was issued a five-day suspension for not properly testing his carbon monoxide monitor, Don Jackson, another white employee, stated in his declaration that he only received a verbal reprimand for the same infraction. And, while Moses was issued a five-day suspension for climbing over a coupler

connecting two train cars, there is no evidence that another employee who committed the same act was ever disciplined at all.

This pattern resulted in Moses being put on a Last Chance Agreement following the coupler incident and then being fired following a November 2015 train derailment (in the technical sense of the term—two wheels of the locomotive slipped off the track) that Defendant asserts was his fault, which Moses disputes. Here, again, there is evidence of disparate treatment: while Moses was initially issued a five-day suspension in connection with the derailment, two white employees who negligently caused a derailment around the same time got off with just a three-day suspension each.

Defendant maintains that Moses's disciplinary incidents are not properly comparable to those of his colleagues. For example, with respect to the derailment, Defendant will point out (and Moses does not dispute) that he was, at the time, subject to a Last Chance Agreement while others disciplined for their involvement in derailments were not. But this elides the point entirely: because all of these incidents involved safety infractions, Defendant's proclaimed policy of "always" enforcing safety rules with five-day suspensions means that any differences between the employees should not have mattered.

Moreover, Moses's discipline history is set against the backdrop of a workplace suffused with casual racism, in which his supervisors (in particular Amel

"Sonny" Brown and Robert Williams) participated. For example, Moses reports that on one occasions Brown quipped "[I]f a black guy can't go get water, what['s] he good for[?]." Moses overheard Williams comment that "he moved–that he has less blacks in his neighborhood. He moved to North Huntington where there's no blacks." Of the six discipline incidents on Moses's record considered by USS labor relator Tegan Groves in making and upholding her termination decision, four were initiated by Brown or Williams.

The district court found Moses's evidence to be insufficient at summary judgment, concluding that Moses established only a weak prima facie case and then failed to produce sufficient evidence of pretext. But Moses's evidence shows that a reasonable jury could find that discriminatory bias infected USS's application of its discipline policies and that the unequal enforcement of those policies was the proximate cause of Moses's termination. Moses also pointed to specific evidence disputing the factual bases for USS's asserted non-discriminatory reason for the termination—its contention that Moses caused the November 2015 derailment. Because Moses made these showings, the district court's decision should be overturned and this case remanded for trial.

# JURISDICTIONAL STATEMENT

## A.    The Basis for the District Court's Jurisdiction

The district court had subject matter jurisdiction over Moses' claim under 42 U.S.C. § 1981 because that claim arises under the laws of the United States. *See* 28 U.S.C. § 1331. The district court had supplemental jurisdiction over Moses' claim under the Pennsylvania Human Relations Act, 43 P.S. § 955, because that claim is so related to Moses' Section 1981 claim as to "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

## B.    The Basis for this Court's Jurisdiction

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court granted Defendant U.S. Steel's Motion for Summary Judgment and entered judgment in Defendant's favor. *See* Appx4-5.

## C.    The Filing Dates Establishing the Timeliness of the Appeal

The district court issued the orders granting Defendant's Motion for Summary Judgment and entering judgment in Defendant's favor on August 24, 2023. *See* Appx4-5. The notice of appeal was filed eight days later, on September 1, 2023. *See* Appx3.

## D.    This Appeal Is from a Final Order or Judgment

The district court's order granting Defendant's Motion for Summary Judgment disposed of Moses' claims in full, with the district court entering judgment in Defendant's favor. *See* Appx4-5.

## ISSUES PRESENTED

1.    The district court found that Moses satisfied his prima facie case by pointing to evidence showing that his supervisors (a) espoused racist sentiments and (b) disciplined Moses more harshly than his white co-workers. USS admits that the cumulative effect of this discipline was the Last Chance Agreement. USS also all but admits, and a reasonable jury could conclude, that without the LCA Moses would not have been fired. Given the unbroken chain linking the biased discipline to the termination, should USS's Motion have been denied?

2.    The district court committed a litany of errors in its analysis at the pretext stage, among them: crediting USS's evidence, discounting Moses's testimony, ignoring the key conclusions of Moses's railroad expert, and drawing inferences in USS's favor. Most troublingly, the district court appears to have held Moses to the now-defunct "pretext plus" standard. Because of these missteps did the district court err by granting USS's Motion?

3.    Moses directly disputed the factual bases supporting Defendant's conclusion that he caused the November 2015 derailment. Given Moses's prima

facie case and the material disputes surrounding the facts of the derailment incident itself, should Defendant's Motion have been denied?

These issues—the causal inferences that may be drawn, the showing Moses must make to establish pretext, and that Moses's evidence establishes pretext—were raised and preserved by Moses in his opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF RELATED CASES

There are no related cases or proceedings.

## STATEMENT OF THE CASE

**Moses testified that he experienced a workplace suffused with racist attitudes.**

Moses was employed by USS for about a decade, beginning his career at USS's Edgar Thomson Works in May 2005 as a Snapper, Labor Grade 1, in the blast furnace. *See* Appx1, 671. Moses advanced up the ranks in the blast furnace, reaching the rank of Keeper, Labor Grade 3, a role in which he exercised greater responsibilities. *See* Appx674, 677. While the first eight years of Moses's time with USS were largely uneventful from Moses testified that, throughout this time, he experienced a workplace rife with overtly racist "jokes" and attitudes expressed by his coworkers and supervisors alike. Appx445-446.

For example, Some of Moses's coworkers quipped that, in the course of training a new employee, Moses was teaching him "ebonics." Appx446. On another

occasion, one of Moses' supervisors, Jay Rosser, said, "[W]hat do you call a black man with a suit[?] . . . [A] defendant." Appx675. Rosser also commented that "[B]lack guys are always late." Appx676. Amel "Sonny" Brown, a supervisor who would later initiate disciplinary actions against Moses that ultimately led to his termination, told another black employee, "[If] a black guy can't go get water, what['s] he good for[?]". Appx675. Robert Williams, another supervisor who, like Brown, played a key role in the build up to Moses's firing, stated that he moved to a different neighborhood to be around fewer black people. Appx675, 681.

Seeking to escape this this environment—in particular Brown and Williams— Moses applied for, and obtained, a transfer from the blast furnace to the transportation department in 2013. Appx447-448. But, because transportation was part of the blast furnace department under the plant's organizational structure, Brown and Williams continued to supervise Moses. Appx448, Around this time, Moses's co-workers presciently joked that Moses "better look out" because Brown and Williams were hiding "in the tree[s]" or "behind the building[s]," watching him. Appx448.

**USS's labor relations department did not ensure that its disciplinary policies were enforced equally.**

Moses's testimony regarding his experience of the workplace culture at USS's Edgar Thomson works does not align with what USS has touted as its purportedly "robust" equal employment opportunity and anti-discrimination policies. Appx404. To be sure, USS's written policies assert that "discriminatory harassment is absolutely prohibited" and mandate that management "at all levels" is responsible for enforcement of this policy. Appx440-441. USS's policies further provide that any report of discriminatory harassment is to be promptly and thoroughly investigated by "individuals who can and will exercise independent judgment" and that the reporting party is to be notified of the results of an investigation. Appx440-441.

Actions speak louder than words, however, and the evidence here shows that USS did not, in practice, adequately implement or enforce these policies. The anti-discrimination training provided to employees and supervisors was, at best, perfunctory, consisting of little more than a short PowerPoint presentation. Appx442, 710, 770. Next, while USS's labor relations employees testified that she believed USS applied its discipline policies equally regardless of race, USS never performed any study or inquiry into whether that was actually the case. Appx444. Finally, although one of USS's labor relations managers testified that an allegation of racial harassment made during a disciplinary hearing should lead to an

investigation, no such action appears to have been taken when Moses accused Brown of just that during a 2014 hearing. Appx440, 452, 707-708.

Moses's management practices expert, Elizabeth Gramigna, summarized the shortcomings of USS's implementation of its policies as follows:

> [USS's] Anti-Harassment and EEO policies were mere words;  its commitment did not adhere to usual and customary standards for cultivating a harassment-free and inclusive work culture  [USS] failed to assure employees of their rights to report without fear of retaliation, to disseminate its policies regularly, and to train or educate employees, supervisors, and labor relations professionals about their rights or responsibilities under the policies. A speak up culture was discouraged by the policy language and by the words of the human resources professionals.

Appx443, 728. Or, as more succinctly put by one such HR employee, USS's policies—in practice—meant that Moses "should be seen and not heard." Appx446, 677.

Although this is a disparate treatment rather than a disparate impact case, USS's apparent inattention to enforcement of its antidiscrimination policies is significant because of the free hand USS supervisors were given to initiate disciplinary action.. According to USS's labor relations personnel, "[l]abor relations is the only department that issues discipline slips." Appx443, 712. However, in practice, because "[l]abor relations relies upon the supervisors' contact to initiate a discipline slip," "unless labor relations is notified, discipline slips aren't issued." Appx443, 712. In other words, while USS supervisors did not determine the precise

sanction that would be imposed for any given infraction, they had significant discretion to decide whether any infraction occurred at all.

Next, USS's Basic Labor Agreement with the union provided a multi-step procedure by which an employee and the union could challenge a disciplinary action. In the case of discipline for a "serious" infraction—*i.e.*, those warranting a five-day suspension subject to discharge, like safety violations—an employee could request a "9(b) hearing" and then, if the discipline was upheld, the employee and union could grieve the discipline through two more levels of review (Step 2 and Step 3). Appx409-410. Critically, though, while labor relations personnel overseeing these hearings were meant to function as neutral arbiters, they appear (at least in Moses's case) to have exercised little more than rubber-stamp oversight. Discussing one such hearing involving Moses, Tegan Groves—who would go on to play a key role in Moses's termination—noted: "The union presented their case. *We* presented *our* case." Appx409-410, 462-463

**USS, through hostile supervisors and pliant labor relators, imposed discipline on Moses for infractions that received little or no discipline when committed by his white coworkers.**

Through his first eight years working at USS, Moses's record shows he was subjected to discipline on just four occasions. Appx583-584. In his final two years, Moses was written-up, suspended, and eventually fired on six occasions, four of which were initiated by either Brown or Williams. Appx583-584. Moreover, these

final six discipline incidents played a determinative role in USS's decision to fire Moses: in her Step 2 decision affirming the termination, Groves expressly relied on Moses's purported "lengthy" discipline history as justifying the decision to fire him. Appx581-582.

With respect to four of these six incidents, the record in this case reveals that Moses's coworkers, most of whom the record establishes were white, consistently received substantially lighter discipline for similar infractions, if they were disciplined at all:

- In July 2013, Brown sought discipline for Moses for stepping off of a moving locomotive.[1] Moses initially received a five-day suspension, subject to discharge. This was subsequently increased to a 10-day suspension, despite this being Moses's first safety infraction. Moreover, Moses testified to having personally witnessed supervisors turn a blind eye to white locomotive operators engaging in similar conduct. Appx448-449.

- In June 2014, Brown again sought discipline for Moses for not faxing an engine report.[2] In the subsequent disciplinary proceedings, Moses's white co-

---

[1] Moses claimed at the time that the locomotive was barely moving, in his deposition likening it to when an automobile's inertia will cause it to nudge as it comes to a complete stop. Appx685. Regardless, the 9(b) hearing notes reflect that Moses conceded that the locomotive was moving as he stepped off. Appx224.

[2] During this incident, Brown harried Moses through the transportation building—even following him into the bathroom—screaming obscenities, calling Moses an "idiot," and accusing Moses of thinking he was "above the rules." Appx450. When Moses, who had gone up to the office to fax his report as instructed, stood up from his chair, Brown called security and initiated discipline because Moses had "threatened" him. Appx450-451. This was the incident that prompted Moses to accuse Brown of racial harassment during the subsequent 9(b) hearing. Appx452, 689. Notably, while a separate entry in Moses's discipline record—for "threatening conduct towards a supervisor—was removed, he was nevertheless punished with a five-day suspension for allegedly committing an "unsafe act." Appx452.

worker, Adam O'Neill, provided a written statement in which he notes that he received no punishment on occasions where he had similarly not faxed his report. Appx450-451; Appx571-572.

- Two months later, in August 2014, Moses was again issued a five-day suspension subject to discharge for failing to "bump test"[3] his carbon monoxide monitor. Appx454. Don Jackson, a white employee, states in his declaration that such infractions were typically dealt with via verbal warning; indeed, Jackson recalled an occasion in which he had not bumped his monitor for a period of weeks and received no discipline. Appx926.

- In October 2014, Williams sought discipline for Moses after he observed Moses climb over a coupler connecting two train cars. Appx453, 576. Incident reports produced by USS disclose another employee engaging in similar conduct. Appx454. There is no evidence this employee was disciplined at all.[4] Appx454, 836-837.

A crucial feature connecting each of these incidents is that they are all safety-related.

Accordingly, USS's explanation for the differences in treatment—that "employee discipline is a fact-specific decision that includes the nature of the offense and the employee's past discipline and the provisions of the Basic Labor Agreement" and that discipline "was determined based on the specific circumstances surrounding the employee's conduct and disciplinary record," Appx834-837—is little more than a

---

[3] Moses described the bump test as being related to a safety protocol for exposure to toxic gases like Carbon Monoxide. Appx683. In other words, a bump test is a simple procedure used to determine that a gas monitor is functioning properly.

[4] Moses notes that this employee's race is not discernable in the record. Appx693. However, even if this employee was black, that fact is not dispositive of this incident fitting into a pattern of Moses receiving significant discipline where others did not. *See Goosby v. Johnson & Johnson Medical Inc*., 228 F.3d 313, 321 (3d Cir. 2000) ("Clearly, an employer does not have to discriminate against all members of a class to discriminate against a given member of that class.").

distraction because, in support of its Motion, Defendant adopted Groves's testimony and claimed as an undisputed material fact that "given USS's commitment to protecting its employees and the community, safety infractions are *always* penalized with a five-day suspension subject to discharge." Appx440 (emphasis added). In other words, individual variations between the precise facts at issue or the particular employees involved should not have mattered and, in light of the racially biased attitudes expressed by Brown, Williams, and others, a reasonable jury could conclude that but for his race, Moses would have received lighter or no formal discipline in connection with the above-mentioned incidents.

**The cumulative effect of the disparate treatment Moses experienced led to the LCA and USS's decision to fire Moses.**

Following the October 2014 incident, Moses was discharged but allowed to return after an extended suspension and on the condition that he be subject to a Last Chance Agreement. Appx474. According to USS, the LCA meant that Moses had "one final opportunity . . . to become and remain a satisfactory employee" and that he understood that he was to comply with all plant rules and regulations. *See* Appx473.

On November 24, 2015, Moses was operating a remote-control locomotive and two train cars in the yard of the Edgar Thompson plant. Appx455, 694. As Moses was reversing the train past a switch point to transfer to a different track, a remote-control malfunction caused the train to not respond when Moses attempted to apply

13

the brakes. Appx455. As a result, the train, moving at only about two miles per hour, rolled over a derailer, causing two of the locomotives' wheels to come off the track. Appx455, 694-695. Once Moses realized the train had derailed, he reported the incident to his supervisor, Keith Martin. Appx455, 694.

Martin subsequently emailed Groves seeking discipline for Moses. Appx455. The incident report, Moses's contemporaneous report, and Martin's email to Groves all note the remote box malfunction. Appx557, 593, 603. Martin's email goes on to claim that Moses was "not standing . . . where he should have been" and that "it is clear the loco was moving so fast." Appx603. Martin had no basis to know the train's speed, and the only individual who observed the train was Brad Horner, the Blast Furnace Coordinator, who wrote in an email on November 25, 2015, that he observed the train approach the derailer at a "slow speed." Appx457.

Moses received a five-day suspension subject to discharge for allegedly performing work in an unsafe manner. Appx457. On December 2, 2015, Groves emailed Horner and Brown asking for updates on Moses. Appx457. Two days later, and after Horner responded "affirm termination," USS fired Moses. Appx457. Moses and the union grieved the termination, which led to a Step 2 hearing on January 5, 2016, with Groves presiding. Appx457. Groves's written decision affirming the termination faulted Moses for the derailment because he allegedly had not provided "head end protection" and failed to immediately contact his supervisor

and instead attempted to re-rail the train himself. Appx425-426, 458. The termination was upheld at following a Step 3 hearing, although no written decision following that hearing was issued.

Moses disputes the facts Groves asserted as supporting her decision to fire him. As an initial matter, Moses notes that five witnesses testified that the remotes were known to malfunction. Appx456-457, 795-796, 806, 814, 843, 847-848. Moreover, USS's initial investigation of the remote box in question found (a) an air leak in the unit "convert[ing] remote signal to air pressure in [the] locomotive," *see* Appx457, 461, and (b) "oil in one of the manifolds," which "[c]ould affect the train line brake," Appx458, 787, 789, 808. And, while third-party testing conducted weeks after the incident indicated no issues with the equipment, Groves does not appear to have requested or reviewed any maintenance records for the remote control in question. Appx458, 461, 788. A reasonable jury would, therefore, not be required to find that Moses's remote box functioned correctly; and, in light of the evidence regarding the remote box—including Moses's affirmative testimony that the train did not respond to his attempts to stop it—there is, at a minimum, a genuine dispute as to whether the remote malfunctioned.

Next, as to the charge that Moses did not provide appropriate head end protection—meaning that he was not in front of the train or in a position to see the area in front of the train—Moses stated at the time and testified in this case that,

standing in position at the switch point, he could see the area in front of the train. Appx459, 689. Furthermore, according to Dr. Alan Zarembski, an expert in the field of railroad operations, Moses was standing in the correct position to provide head end protection for the operation he was performing. Appx459. Dr. Zarembski has further explained, as shown by contemporaneous records, that the derailer—which lies on the ground close to the tracks, and so is difficult to see—was not properly flagged in accordance with industry standards. Appx459. Accordingly, Dr. Zarembski concluded that where Moses was standing was not the root cause of the incident. Appx459. Again, Moses's evidence points to genuine disputes as to the factual bases that allegedly support Groves's decision.

Finally, Moses's written report and testimony indicate that he informed his supervisor as soon as he realized the train had derailed. Appx455, 460. Moreover, Moses denied at the time that he attempted to rerail the train. Appx595. Indeed, other incidents (which do not appear to have resulted in any discipline) indicate that other employees provided appropriate notification when, after experiencing some unexpected irregularity, their subsequent investigation revealed that the train they were operating had derailed. Appx461.

All that said, the ultimate cause of Moses's termination was not the derailment incident itself, but the accumulation of discipline USS issued to Moses, as USS itself tacitly admits. Appx462. Groves's written determination specifically points to

Moses's "lengthy discipline record" and the LCA as justifying the decision to fire him. That is, given the discipline meted out to white employees who USS found at fault for derailments—two three-day suspensions and a one-day suspension that was later dropped—it is reasonable to infer that Moses would not have been fired for the derailment alone. Rather, based on the evidence described above, the underlying cause of USS's decision to fire Moses was an accumulation of disciplinary actions, initiated in large part by Brown and Williams, for which Moses received substantially more severe punishments than his white coworkers.

## PROCEDURAL HISTORY

Moses initiated this litigation by writ of summons filed in the Court of Common Pleas of Allegheny County, Pennsylvania (No. GD-19-16834) on November 27, 2019. Moses then filed his Complaint on May 17, 2020. USS accepted service on May 19 and then removed this case to the Western District of Pennsylvania on May 22, 2020. Following the close of discovery, USS filed a Motion for Summary Judgment on September 9, 2022. On August 24, 2023, the district court granted Summary Judgment in favor of Defendant. This appeal was timely filed on September 1, 2023.

## SUMMARY OF THE ARGUMENT

Moses's evidence establishes that he was subjected to unequal application of USS's discipline policies amidst a workplace environment in which his supervisors openly expressed racist sentiments. Two of these supervisors—Brown and

17

Williams—initiated the lion's share of discipline leading up to Moses's termination. Moses contends that, when his evidence is taken as true and the record as a whole is considered, he has presented far more than the "close" prima facie case of discrimination described by the district court. Indeed, if the causal chain linking the disparate treatment inflicted on Moses by Brown and Williams is followed to its logical conclusion, a reasonable jury could conclude not only that Moses established a prima facie case of unlawful discrimination under Section 1981 and the PHRA, but that their actions proximately led to the Last Chance Agreement and, ultimately, Moses's termination. Moses argued below, but the district court appears not to have considered, that the strength of this causal link should have been sufficient to defeat USS's Motion and, moreover, allowed him to proceed on a subordinate bias/cat's paw theory of liability.

Moreover, even if Moses's prima facie showing was not enough, on its own, to survive summary judgment, Moses contends that he presented sufficient evidence of pretext to get to a jury. In concluding otherwise, the district court credited USS's evidence, drew inferences against Moses, and appears to have applied a "pretext plus" analysis, requiring Moses to do more than show that USS's asserted nondiscriminatory reason for the termination—its contention that Moses caused the November 2015 derailment—was factually false, but to instead point to affirmative evidence of discrimination at the pretext stage. In so doing, the district court based

18

its decision on an outmoded and incorrect framing of the pretext analysis. And, when Moses's evidence of pretext—taken as true and viewed in the light most favorable to him—is considered under the correct framework, he has presented sufficient evidence to raise genuine disputes of fact as to the factual bases of USS's proffered explanation for the termination decision.

In short, USS's Motion should have been denied. The district court's decision granting summary judgment in Defendant's favor should be reversed, and this case should be remanded for trial.

## ARGUMENT

### I.    Standard of Review

A district court's decision to grant a motion for summary judgment is subject to *de novo* review. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 345 (3d Cir. 2022) (citation omitted). In conducting this analysis, a reviewing court uses the same test and standards that the lower court should have applied. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). Accordingly, "[t]his Court can affirm a grant of summary judgment only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting Fed. R. Civ. P. 56(a)), *amended,* 979 F.3d 192 (3d Cir. 2020).

To evaluate whether genuinely disputed material facts are present in the record, the evidence must be viewed in the light most favorable to the non-moving

19

party and all reasonable inferences drawn in his favor. *See Burton*, 707 F.3d at 425. For a factual dispute to be material, its resolution must be capable of affecting the outcome of the case under the applicable law. *See Canada*, 49 F.4th at 345. And, a dispute of material fact is genuine only if the evidence at issue would permit a reasonable jury to decide in favor of the nonmoving party. *See id.* In short, "[t]his trial 'on paper' differs from a trial before a jury in one significant detail: 'at the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Three important principles, which function to preserve the role of the jury in our system of justice, follow from this analytical structure. First, "[t]he court must review the record 'as a whole.'" *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Industrial co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *see also Andrews v. Philadelphia,* 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.") (superseded by statute on other grounds). Second, the non-movant's evidence is to be taken as true, such that any contradiction between the parties' evidence must be resolved in favor of the non-

moving party. *See Big Apple BMW, Inc.,* 974 F.2d at 1363 (3d Cir. 1992) (citation

omitted). Third, and finally, the court must not weigh the evidence or make

credibility determinations. *See Burton*, 707 F.3d at 428-29 (citing *Doe v. Luzere*

*Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011). Accordingly, the court "must disregard"

evidence favoring the moving party "that the jury is not required to believe," such

that "the court should give credence to the evidence favoring the nonmovant as well

as that 'evidence supporting the moving party that is uncontradicted and

unimpeached, at least to the extent that that evidence comes from disinterested

witnesses.'" *Reeves* 530 U.S. at 151 (2000) (citations omitted); *see also Hill v. City*

*of Scranton*, 411 F.3d 188, 131 n.22 (3d Cir. 2005) ("when evaluating a summary

judgment motion a court should not consider even uncontradicted testimony of an

interested witness where that testimony supports the movant.").[5]

---

[5] Since the Supreme Court's decision in *Reeves,* this final precept of summary judgment practice has become perhaps the most controversial. Just a few years after *Hill*, in which this Court embraced a fulsome interpretation of *Reeves*, another panel of this Court offered a much more limited reading of the "interested witness" rule in *Laruen W. v. DeFalminis*, 480 F.3d 259, 272 (3d Cir. 2007), commenting that "when evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." The apparent incongruity between *Reeves* and *Hill* on the one hand and *Lauren W.* on the other has caused some consternation for the district courts. *See, e.g., Kelly v. U.S. Steel Corp.*, 2:11-cv-00193, 2012 U.S. Dist. LEXIS 107475, at *7-8 (W.D. Pa. Aug 1, 2012) (discussing contradiction). Of course, "'although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, a panel may reevaluate a precedent in light of intervening authority.'" *Covell v. Bell,* 651 F.3d 357, 364 (3d Cir. 2011) (citation omitted); *see also* 3d Cir.

As discussed in more detail below, the district court violated each of these strictures in its analysis here: (1) it failed to consider the whole record at either the prima facie or the pretext stage; (2) it discredited or ignored evidence and testimony from Moses contradicting key facts underpinning the notion that he "caused" the 2015 derailment; and (3) the district court credited the testimony and conclusions of USS's witnesses despite Moses pointing to contradictory evidence. Even more concerning than these errors, the district court also failed to address Moses's

---

I.O.P. 9.1 (2023). As there was no "intervening authority" (nor did the panel cite any), the statement in *Lauren W.* should properly be regarded as nonbinding dicta.

Indeed, the only support cited for the proposition advanced in *Lauren W.* is an incomplete hypothetical involving a "controlled intersection traffic accident case" in which a moving defendant presents testimony that she had the green light and the plaintiff presents "no contrary evidence"—*i.e.*, no evidence of what color the light was, let alone that his light was green. 480 F.3d at 272 n.13. To be sure, awarding summary judgment to the defendant in such a case would be correct, but not because, as stated by the panel, the uncontradicted defendant's testimony should be accepted. Rather, without any evidence from which a jury could conclude he had the right of way, the plaintiff in such a case lacks essential evidence to support his claim. In other words, plaintiff's own evidence, even taken as true, leaves the case at a 50/50 impasse. If such a case went to trial, the defendant would properly be granted judgment on a Rule 50 motion at the close of plaintiff's case in chief because the plaintiff would fail to present any evidence from which the jury could conclude defendant was at fault. On the other hand, if plaintiff had *any* evidence from which defendant's liability could be inferred (even if it did not directly contradict defendant's testimony), the problem with accepting defendant's evidence as true at summary judgment becomes immediately obvious: in doing so, the court would be making a back-door credibility determination and invading the fact-finding role of the jury. *See Anderson v. Potter,* 723 F. Supp. 2d 368, 372 n.4 (D. Mass. 2010).

All that said, because Moses presented evidence contradicting the testimony of Defendant's interested witnesses, the conflict between *Hill* and *Lauren W.* need not be resolved in this case.

contention (supported by substantial record evidence) that summary judgment in this case is inappropriate based on either the strength alone of the causation showing in his prima facie case or under a subordinate bias/cat's paw theory of liability.

Here, Moses's evidence establishes an unbroken chain of causation linking the expressed racial bias of his supervisors, the disparate disciplinary sanctions he was subjected to, and USS's decision to terminate him. Accepted as true for summary judgment, this evidence shows that but for Moses's race he would not have been fired. *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009, 1019 (2020) (holding that Section 1981 plaintiff must "ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). Moreover, the apparently unquestioning adoption of supervisor disciplinary recommendations by USS's HR personnel, coupled with USS's (a) failure to investigate Moses's complaint of racial harassment and (b) failure to meaningfully implement its EEO policies, shows that the actions of these biased supervisors proximately caused Moses's termination, properly exposing USS to liability under a subordinate bias/cat's paw theory.

The district court, however, all but ignored these causation arguments, cherry-picked and weighed evidence, and credited USS's witnesses in the face of contradictory evidence from Moses. For these reasons, the district court's decision must be reversed.

**II.    Moses's evidence, which must be taken as true, establishes a direct and unbroken causal link between his supervisor's bias and Defendant's decision to fire him.**

Disparate treatment claims under Section 1981 and the PHRA, like Moses's, are governed by the same substantive standards and analytical framework as those that apply to similar claims under Title VII. *See Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181-82 (3d Cir. 2009) (noting "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n. 8 (3d Cir. 2016) (noting that disparate treatment claims under Title VII and the PHRA "are governed by essentially the same legal standards."). Both of Moses's claims, therefore, may be analyzed under the three-step burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n. 8 (3d Cir. 2016).

At the first step of the *McDonnell Douglas* analysis, the plaintiff must present evidence establishing a prima facie case of discrimination. This requirement "is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To satisfy this burden, Moses must present evidence showing that (1)

he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Barnes v. Nationwide Mut. Ins. Co.*, 598 Fed. App'x 86, 89 (3d Cir. 2015) (citation omitted). Only the fourth and final element has ever been in dispute here.

That element requires "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Cons. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (cleaned up). Common methods of establishing this inference include showing that the plaintiff was replaced by someone outside of his protected class or that employees outside his protected class were treated more favorably than him. *See Pivirotto v. Innovative Sys.,* 191 F.3d 344, 356 (3d Cir. 1999). However, these methods of proof are not exclusive because "[t]he 'central focus' of the prima facie case 'is always whether the employer is treating some people less favorably than others'" because of their membership in a protected class; as such, a plaintiff need only "establish some causal nexus between his membership in a protected class and the decision to [fire] him." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

Here, for the reasons discussed below, not only does Moses's evidence establish the bare causal nexus necessary to support a prima facie case, it goes quite a bit further. Taken as true, and considered in full, Moses's evidence shows that but

for his race he would not have been fired and that the discriminatory bias of his supervisors (principally Brown and Williams) was the proximate cause of his termination. This should have been sufficient to defeat USS's Motion. To be sure, Moses's firing was the culmination of a drawn-out process over several years—a slow burn. But, like a fuse once lit and never put out, the discriminatory conduct of Moses's supervisors led inexorably to Moses's firing: Moses was subjected to discipline for alleged infractions that drew little or no discipline for white employees; the accumulation of these demerits led USS to impose the LCA; and the LCA was the indispensable factor supporting USS's decision to terminate Moses's employment.

### A. Moses presented a much stronger causal connect than the district court's analysis suggests.

The district court correctly recognized that Moses's evidence established at least the minimum causal nexus between the disparate treatment he received and his termination necessary to satisfy a prima facie case of discrimination. However, while calling Moses's prima facie case "a close call," Appx15, the district court does not appear to have considered all of the evidence Moses presented at the prima facie stage and, as a result, failed to follow the causal chain this evidence establishes to its logical conclusion. Respectfully, at least for purposes of summary judgment, Moses's prima facie case was only ever "close" because the district court declined

to draw obvious causal inferences—explained at length by Moses in his briefing below—from the record evidence. *See* Appx396-399; Appx984-986.

Start with the causal inference that the district court did draw. In its discussion of the prima facie case, the district court noted that "Moses's termination was predicated, in part, on his 'lengthy disciplinary record,' a record which Brown and Williams participated in developing." Appx16. Indeed, as the district court noted, four of the six disciplinary incidents on Moses's record during the last two years of his employment with USS—and four of the six considered by Groves in making her termination decision—were initiated by Williams or Brown. Appx15-16.

Yet in conducting its analysis of Moses's prima facie case, the district court focused on just one entry in Moses's discipline record—the June 2014 incident in which Brown harassed Moses over an unfaxed engine report—and USS's failure to follow up on Moses's claim that Brown had targeted him on account of his race. Appx16. On the basis of these limited facts, the district court concluded that Moses had satisfied his prima facie case. Appx16-17. But Moses's evidence, when taken as true and viewed in full, establishes more than the weak causal inference implied by the district court's reasoning.

### i. Moses's evidence shows a racially biased atmosphere permeated his workplace.

As detailed above, Moses encountered discriminatory sentiments from both his supervisors and his coworkers during his time working for USS. Appx675-676,

681. While the district court took some note of Moses's testimony on the subject, it appears to have ultimately rejected much of it—everything except comments from Brown and Williams—as "largely unsubstantiated" and mere "stray remarks." Appx15.Appx15. However, this testimony—which, based on Moses's own personal experience and observation, must be taken as true for purposes of summary judgment—goes beyond mere personal feeling and speculation, describing specific occasions on which Moses's supervisors and/or coworkers made explicitly racist comments. As such, it should have been taken into consideration as "evidence of the atmosphere in which the employment decision was carried out" as such evidence "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Walden v. Ga.-Pacific Corp*., 126 F.3d 506, 521 (3d Cir. 1997) (citations omitted) (cleaned up).

Combined with evidence that (a) USS's supervisors were entrusted with initiating discipline (that is, without a supervisor request no disciplinary action would be taken), Appx443, 712-713, and (b) USS's HR personnel rubber-stamped supervisor's discipline requests, a reasonable jury could find such evidence provides significant additional "color" to USS's "decisionmaking processes and to the influences behind the actions taken with respect to" Moses. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir. 1992). In other words, the volume and variety of Moses's evidence regarding the biased atmosphere of his

workplace—beginning with Moses's coworkers joking that he was teaching a trainee "ebonics," Appx446, continuing up to his supervisors making "jokes" like "if a black guy can't go get water, what is he good for[?]," Appx675, and culminating with an HR department that, at best, took a "see no evil" approach to enforcement of its anti-discrimination policies—could lead a reasonable jury to conclude that impermissible racial bias infected the application and enforcement of USS's discipline policies.

### ii. *Moses's evidence allows a reasonable factfinder to draw a clear inference of disparate treatment.*

Next, Moses's evidence establishes that he was subjected to more severe disciplinary treatment than his white coworkers on multiple occasions for similar alleged infractions, not just the engine report incident. While each of these incidents are relevant to building Moses's case that he was terminated because USS differentially applied its discipline policies on account of his race, the alleged safety-related infractions warrant specific consideration.

At the outset, it is key to note USS's self-contradictory statements about how it handled discipline for safety-related incidents. On the one hand, USS maintains that none of the employees involved in incidents similar to Moses's are properly comparable because "employee discipline is a fact-specific decision that includes the nature of the offense and the employee's past discipline and the provisions of the Basic Labor Agreement" and that "[a]ny discipline given in 2016 was determined based on the specific circumstances surrounding the employee's conduct and

disciplinary record, including being on a last chance agreement." Appx836-837. On the other hand, and in support of its Motion, USS adopted Groves's testimony and asserted as an undisputed material fact that "given USS's commitment to protecting its employees and the community, safety infractions are *always* penalized with a five-day suspension subject to discharge." Appx408 (emphasis added).

USS cannot have it both ways, and at summary judgment the contradiction must be resolved in Moses's favor. Here, Moses's discipline record includes multiple alleged safety-related infractions, with Moses receiving in each case *at least* a five-day suspension. By contrast, the evidence in the record concerning white employees committing the same or similar infractions discloses no instance in which even a five-day suspension was imposed, let alone any more sever sanction. Specifically:

- Moses was suspended for ten days for stepping off of a nearly-stopped locomotive. Brown initiated this disciplinary action. Moses testified that he observed white locomotive operators commit similar acts without being disciplined at all. While USS and the district court discounted Moses's testimony on this subject as speculative, Moses testified on the basis of his personal experience and first-hand observations; any issue with the lack of specificity in Moses's testimony goes to weight and credibility, which cannot be resolved at summary judgment. His testimony must therefore be accepted as true at this procedural juncture. Appx448-449.

- Moses received a five-day suspension for the "unsafe act" of having an unfaxed engine report.[6] Brown initiated this disciplinary action. O'Neill, who is white, reported not receiving any discipline whatsoever for similar infractions. Appx450-451.

- Moses received a five-day suspension for failing to "bump test" his CO monitor. Don Jackson, who is white, states in his declaration that such an infraction typically receives nothing more than a verbal warning; that is precisely what happened with Jackson when he forgot to "bump" his monitor for a period of weeks in 2016. Appx454, 926.

- Moses received a five-day suspension for climbing over a train coupler, which was later converted to an extended suspension and LCA. Williams initiated this discipline. The record includes evidence of another employee committing a similar act. However, there is no evidence that this employee received any discipline at all. Appx453-454. To be sure, USS's responses to Moses's Requests for Admission on the subject are evasive and non-committal; in any case, this gap in the evidence (*i.e.*, that there is no evidence concerning what sanction, if any, this employee received) must be resolved in Moses's favor at summary judgment.

- Moses received a five-day suspension for his involvement in the 2015 derailment. Appx455, 694. Evidence from USS confirms that around the same time, three white employees were disciplined for derailment-related infractions. Appx463. These employees received three- and one-day suspensions, with the one-day suspension being subsequently revoked. Appx825. Moses notes further that the derailment resulting in the three-day suspensions was deemed by USS to be both more likely to recur and potentially more severe than Moses's. *Compare* Appx643-645 (noting the three-day suspension incident as "Frequency of Occurrence: LIKELY…Potential Severity: SERIOUS.") *with* Appx558 (Moses's incident categorized as "Frequency of Occurrence: RARE…Potential Severity: MODERATE").

---

[6] Note that the only other alleged infraction associated with that incident—that Moses purportedly "threatened" Brown—is listed on Moses's discipline record as "removed," leaving only the unfaxed report itself as the "unsafe act." Appx583-584.

In short, USS's stated position that "safety infractions are *always* penalized with a five-day suspension subject to discharge," Appx440, cannot be squared with the fact that there is absolutely no evidence that any white employee received such a sanction for committing safety infractions similar to (if not the same or worse than) those alleged to have been committed by Moses. When coupled with Moses's extensive evidence concerning the biased atmosphere of his workplace, the inference that must be drawn at summary judgment is that unlawful racial bias infected USS's application of its discipline policies to Moses. In other words, based on this record a reasonable jury could conclude that had Moses been white, he would not have received as many or as severe disciplinary sanctions as he did.

> iii.    *The inference that must be drawn at summary judgment is that supervisor bias was a but-for cause of Moses's termination.*

Nowhere in its discussion of the prima facie case does the district court mention—let alone analyze—the part played by the LCA in USS's decision to fire Moses. This is a crucial oversight, as the LCA is the indispensable element USS relies on to justify its decision to terminate Moses's employment. As an initial matter, there is no evidence to suggest—and USS does not suggest—that Moses would have been fired for his involvement in the 2015 derailment standing alone. Indeed, as noted above, there's no evidence any of the approximately 30 other employees involved in a derailment around the same time was fired, let alone subjected to USS's purportedly mandatory five-day suspension for such safety

infractions. Appx463. In other words, while the 2015 derailment was necessary to trigger the final steps towards Moses's termination, it was not itself sufficient for USS's adverse action. Instead, the LCA was the decisive factor: Groves testified that when making her decision to terminate Moses following the November 2015 derailment she considered "the severity of the infraction and the employee being on a Last Chance Agreement." USS further emphasizes the point in its briefing below, stating that it was *required* to terminate Moses following the derailment *because* of the LCA. Appx63.

This matters because of the evidence, described above, concerning the unlawful and discriminatory bias that infected USS's application of its disciplinary policies to Moses. According to USS, it required Moses to sign the LCA because of the accumulation of disciplinary incidents in his record. As shown above, at every step along the way Moses received a severe sanction where his white colleagues received little or no discipline at all. Take for example the engine report incident, Appx450-451, which is one of the safety-related infractions supporting the decision to fire Moses. Appx581-582. Based on the record evidence, a reasonable jury could conclude that had Moses been white—like his colleague O'Neil—he would have received nothing more than a verbal warning. The same goes for the CO monitor incident: a reasonable jury could conclude that had Moses been white—like his colleague Don Jackson—he would have received nothing but a warning.

Faced with this evidence, a reasonable jury could well conclude that, had Moses been white, his standing with USS at the time of both the LCA and his termination would have been much different. In other words, a jury could reasonably conclude that, but for his race, Moses would not have been put on the LCA in the first place, let alone fired. *See Bostock v. Clayton Cnty.,* 140 S.Ct. 1731, 1739 (2020) ("In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause."). Pulling these strands of evidence together—and viewing them as a whole in the light most favorable to Moses—a reasonable jury could conclude that but for his race, Moses would not have been fired.

### B.    Moses's evidence is sufficient to establish subordinate bias/cat's paw liability.

Even if the district court's pretext analysis was correct—which it was not, for the reasons discussed below—Moses nevertheless should have been permitted to proceed to trial on a subordinate bias/cat's paw theory of liability. Moses raised this argument below, contending that based on his prima facie case a reasonable jury could conclude that the bias exhibited by his supervisors (principally Brown and Williams) proximately caused his termination. *See* Appx396-399; Appx984-986. On

that basis alone, the district court's decision to grant summary judgment in favor of USS should be reversed.

Under the cat's paw theory, a "supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011). In other words, "[t]he employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id.* Accordingly, this Court has said that "[w]e allow plaintiffs to proceed under a cat's paw theory if a supervisor exhibiting discriminatory animus influenced or participated in a decision to take an adverse employment action and if such animus was a proximate cause of the ultimate decision." *Sterrett v. Giant Eagle, Inc.*, 681 Fed. App'x 145, 151 (3d Cir. 2017) (citing *McKenna v. City of Phila.,* 649 F.3d 171, 172, 177-180 (3d Cir. 2011) and *Staub*, 562 U.S. at 420). Proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'" *Jones v. S.E. Pa. Transp. Auth*, 796 F.3d 323, 330 (3d Cir. 2015) (quoting *Staub*, 562 U.S. at 419). Finally, "the underlying principles of agency upon which subordinate bias theories are based apply equally to all types of employment discrimination." *Marcus v. PQ Corp.*, 458 Fed. App'x

207, 212 (3d Cir. 2012) (quoting *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949-50 (10th Cir. 2011).

Here, the district court acknowledged that "Moses's termination was predicated, in part, on his 'lengthy discipline record,' a record which Brown and Williams participated in developing." Appx16. With respect to the district court, and as shown by Moses's evidence, the record in this case establishes more than that; namely, but for his discipline record—which led to the LCA—Moses would not have been fired. Indeed, Groves says in her decision upholding Moses's termination:

> The Grievant [*i.e.*, Moses] has a lengthy disciplinary history. On April 22, 2015, Grievant signed a Last Chance Agreement with the understanding that he must comply with all plant rules and regulations and failure to comply with all plant rules and regulations would result in suspension subject to discharge. It was also the understanding of the Grievant that [th]is was the final opportunity for him to become and remain a satisfactory employee.

Appx582. In short, not only did the discriminatory conduct of Brown and Williams influence USS's decision to terminate Moses's employment, those acts formed the very load-bearing foundation on which that decision rested. To be sure, the effect of the differential discipline Moses was subjected to built up over an extended period. But, as this Court recognized in *Andrews v. Philadelphia,* 895 F.2d 1469, 1484 (3d Cir. 1990), "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." And, like Chekhov's gun,

36

the effects of Brown and Williams targeting Moses—*see* Appx668 (Moses testifying that his coworkers joked "Sonny Brown is in the tree, Bobby Williams is behind the building. Ken, you better look out.")—were ultimately felt in the LCA and the decision to terminate.

### III.    Moses presented sufficient evidence to establish pretext.

At the final stage of the *McDonnell Douglas* analysis, after the defendant has carried its burden of coming forward with a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must point to sufficient evidence from which a reasonable jury could find that defendant's stated reason for the adverse action was pretextual. USS argued below that it had just one non-discriminatory reason, its allegedly legitimate conclusion that Moses caused the 2015 derailment: "Given these circumstances and the evidence presented to the Company's representatives, they…supported Moses's termination—concluding he was at fault for the derail, *forming USS's legitimate, nondiscriminatory reason.*" Appx58 (emphasis added). In other words, as the district court put it, "[b]y its very nature, once Moses was placed on the LCA, he had one last chance to abide by USS's rules and regulations. According to USS, when he failed to do so, USS terminated his employment." Appx17.

Here, Moses's evidence directly contradicts the factual bases supporting USS's alleged conclusion that Moses "caused" the November 2015 derailment.

Moreover, as detailed above, Moses's evidence is sufficient for a reasonable jury to conclude that unlawful discrimination formed a but-for cause of USS's decision to fire him. Either or both of these arguments should have been enough to defeat USS's Motion, even if Moses's evidence is not sufficient to proceed on a cat's paw theory. *See Reeves,* 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

### A.  To demonstrate pretext, a plaintiff need only present sufficient evidence from which a reasonably jury could disbelieve the employer's proffered explanation.

The standards for establishing pretext at summary judgment are well-settled in this Circuit. Thirty years ago,this Court explained that,

> [A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). "Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.*; *see also Fasold v. Justice*, 409 F.3d 178, 186-87 (3d Cir. 2005) (noting that "the factfinder's disbelief of the employer's explanation plus proof of the elements of the prima facie case may

be enough for the factfinder to infer the ultimate fact of discrimination" and that "[n]o affirmative or direct evidence of discrimination is required.").

In concluding, however, that Moses had not satisfied his burden at the pretext stage, the district court discounted or ignored significant evidence presented by Moses and instead credited the explanations proffered by USS. It also, in effect, held Moses to a "pretext plus" standard—requiring him to go beyond presenting his prima facie case coupled with evidence from which a factfinder could disbelieve the reasons alleged by USS for its decision and provide additional proof of discriminatory animus directed at him. *See, e.g.,* Appx26 ("Notably, O'Neill's statements made no mention of race. While such evidence was sufficient to establish his prima facie case, at the pretext stage, Moses needs more."). Such a view of the pretext analysis has been squarely rejected by this Court.

The district court's heavy reliance on *Jones v. School Dist.,* 198 F.3d 403 (3d Cir. 1999), is revealing. Decided the year before *Reeves,* the *Jones* court affirmed the district court's dismissal at summary judgment of the plaintiff's racial discrimination claims because "he presented no evidence from which a jury could conclude that the school district's articulated reasons for its adverse employment actions were a pretext for discrimination." *Id.* at 414. Following *Reeves,* however, this is simply not the standard any longer. In *Fasold v. Justice* this Court explained the state of the law as follows:

In *Reeves*, the Court rejected the view of those circuits that had granted summary judgment for the employer on the ground that the terminated employee had failed to prove more than employer pretext (the "pretext plus" cases). Citing its prior decision in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), the Court reaffirmed its holding that the factfinder's disbelief of the employer's explanation plus proof of the elements of the prima facie case may be enough for the factfinder to infer the ultimate fact of discrimination. *Reeves*, 530 U.S. at 146-47. No affirmative or direct evidence of discrimination is required…

409 F.3d 178, 186-87 (3d Cir. 2005). In other words, by insisting that Moses was required to produce additional evidence of discrimination at the pretext stage, the district court applied an outmoded analytical framework.

*Jones* is, moreover, distinguishable on the facts as well. Unlike *Jones*, where the plaintiff rested much of his pretext argument on "allegations in his affidavit which he predicate[d] on nothing more than his beliefs without having actual knowledge of them," *Jones,* 198 F.3d at 414, as discussed in more detail below, Moses has come forward with evidence directly disputing the proffered factual bases for USS's alleged conclusion that he "caused" the November 2015 derailment. In that respect, this case is more analogous to *Fasold*, in which this Court reversed the district court's decision granting summary judgment because the plaintiff had adduced specific evidence—including his own testimony—disputing the factual underpinnings of the defendants' proffered reasons for terminating his employment. *See* 409 F.3d at 187-88. On that basis, this Court concluded that "Fasold's prima facie case, combined with the evidence that is capable of refuting USS's asserted

nondiscriminatory reasons, would allow (but certainly not require) a factfinder to determine that Defendants fired" him for discriminatory reasons. *Id.* at 188.

**B.    Moses presented sufficient evidence to raise genuine disputes of material fact as to pretext.**

As an initial matter, the district court appears to have disregarded USS's assertion that Moses "lied" about the facts surrounding the derailment. *See* Appx56. Moses has consistently maintained since the incident that he was standing at the switch point with appropriate head end protection, Appx459, 689; that the train was moving slowly (about two miles per hour), Appx457; that the locomotive did not respond when he attempted to apply the brakes using the remote box, Appx455; that once he realized the train had derailed, he called his supervisor; and that he did not attempt to rerail the train himself. Appx595. Accepting USS's contention that Moses dissembled regarding these events would necessitate (a) failing to accept Moses's evidence as true and (b) determining that Moses's testimony is not credible, neither of which is permissible at summary judgment. That said, it is worth pointing out that a reasonable jury that found Moses credible would also be permitted to find that a spurious accusation of dishonesty is evidence of pretext.

Next, there is a genuine dispute as to whether Moses was positioned to provide appropriate head end protection. Notably, USS's "head end protection" rule does not require an operator to be physically in front of his train; instead, head end protection can be provided by "assuming a position which will enable [the operator] to see the

41

area ahead of the lead car or locomotive." Appx458. Moses testified that, from where he was standing at the switch point, he could see the area in front of the locomotive. Moreover, according to Dr. Zarembski, an expert in railroad operations, Moses was in the correct position for the maneuver he was performing—that is, standing in a position near the switch that allowed him to see both (a) the area ahead of the train and (b) when the rear wheels of the train cleared the switch. Appx459.

Furthermore, Groves's assessment to the contrary—that Moses "walk[ing] back to see how far" the train had traveled somehow "validat[ed]" that he did not provide head end protection, Appx582—makes little sense if Moses's evidence is taken as true (which it must be). First, the train traveled only about six feet past the derailer before coming to a stop—hardly a sufficient distance from which to conclude Moses was unable "to see the area ahead of the lead car or locomotive." Second, Moses's action—moving to assess the situation after an unexpected failure of his remote box to communicate with the locomotive—is consistent with Defendant's Stop and Act rule, as described in Groves's Step 2 Minutes.

Indeed, Moses also directly disputes USS's contention that he failed to promptly notify his supervisor of the incident and instead tried to rerail the train himself. To the contrary, Moses testified that as soon as he realized the train had derailed, he called his supervisor. This is consistent with Moses's written report, completed shortly after the incident, in which Moses states that after he "noticed the

engine had derailed[,] I contacted the furnace supervisor to make him aware of the situation." Appx593. He also denied that he attempted to rerail the train himself. Appx595 ("You didn't try to bring it to you? I didn't do that."). Notably, the district court was dismissive of Moses's suggestion that the time within which he provided notice was consistent with other derailment incidents; however, the point of Moses's comparison was that in each of these other incidents the personnel involved (a) experienced something abnormal with the operation of their train, (b) "walked back" or otherwise proceeded to "investigate," and (c) only then, after discovering the derailment, notified their supervisor.

Next, Moses has consistently maintained that he attempted to apply the brakes but some malfunction involving the remote box caused the locomotive to fail to respond. USS's initial testing shortly after the incident (1) revealed an "air leak in [the] unit which converts remote signal to air pressure in locomotive (however air pressure read good)" and (2) "found oil in one of the manifolds" which "could effect train brake." Appx 457, 458, 461, 787, 789, 808. Furthermore, problems with the remote boxes were a known issue among both Moses's colleagues and his supervisors. Indeed, a statement submitted by one of Moses's coworkers during the grievance process describes occasions where "[y]ou go to hit the break [sic] and it throttles up." Appx585. On the other hand, USS's assertion that the equipment used during the incident functioned properly was based primarily on testing completed

weeks after the incident. A reasonable jury would not be required to conclude that such testing conclusively demonstrates the equipment worked properly on the night in question; moreover, at summary judgment, Moses's testimony that he attempted to apply the brakes must be taken as true.

Finally, USS's failure to consider that the derailer itself was not properly flagged provides additional support for the proposition that Defendant's assertion that Moses caused the derailment is not worthy of credence. Dr. Zarembski testified that Moses would not have been able to see the derailer unless it was properly marked. Appx908, 912-914. The "Union Record" cited in Groves's decision notes that "there is no (blue) flag on the derailer which should be about ten (10) feet before derailer." Appx581, 589. Moses testified that the flag was absent on the night of the derailment. Appx695. A reasonable jury would be entitled to view this omission—*i.e.*, an apparent attempt to avoid a significant fact running contrary to USS's position that Moses "caused" the derailment—as undercutting Defendant's proffered explanation.

In sum, given the evidence supporting Moses's prima facie case—which yields, at a minimum, an inference that the LCA was the end result of disparate application of USS's discipline policies—and the numerous disputed facts regarding the derailment, Moses's showing was sufficient to establish pretext. Accordingly, the district court's decision should be overturned.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the case should be remanded for trial on Moses's Section 1981 and PHRA claims.


Date: March 6, 2024

Respectfully Submitted,

*/s/Bruce. C. Fox*
Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
Hugh T. McKeegan
hugh.mckeegan@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
Tel:    (412) 566-1500

*Attorneys for Appellant*
*Kenneth Moses*

## COMBINED CERTIFICATION OF COMPLIANCE

I, Bruce C. Fox hereby certify as follows:

1.    I am a member in good standing of the Court of Appeals for the Third Circuit.

2.    The Brief submitted in this matter on behalf of Appellants complies with the type-volume limitation of Rule 32(a)(7)(B)(i) because it contains 11,080 words; complies with Rule 32(a)(5) because it uses a 14 point Times New Roman font; and complies with Rule 32(a)(4) because it is double spaced, with required margins on appropriate 8.5 by 11.0 inch paper.

3.    This Brief was electronically filed with the Court on March 6, 2024 and served on counsel of record for all parties via the CM/ECF Filing System.

4.    The electronic version of this Brief is identical to the hard copy of said Brief.

5.    The electronic version of this Brief was checked for computer viruses using [id virus scan program] prior to transmittal.

I hereby certify subject to the penalties of perjury that the foregoing statements made by me are true.

Date: March 6, 2024                    /s/ Bruce C. Fox

No. 23-2605

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

KENNETH MOSES,

*Plaintiff-Appellant*,

v.

UNITED STATES STEEL CORPORATION,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:20-cv-00752-WSS
Hon. William S. Stickman IV

---

## JOINT APPENDIX – VOLUME I

---

BRUCE C. FOX
ANDREW J. HOROWITZ
HUGH T. MCKEEGAN
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place Suite 1710
Pittsburgh, PA 15219
*Counsel for Plaintiff/Appellant*

MARLA N. PRESLEY
LAURA C. BUNTING
JACKSON LEWIS P.C.
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
*Counsel for Defendant/Appellee*

# TABLE OF CONTENTS

**Document**                                                          **Page**

[ECF No. 83]    Notice of Appeal                                      Appx3

[ECF No. 82]    Judgment Order                                        Appx4

[ECF No. 81]    Order Granting Motion for Summary Judgment            Appx5

[ECF No. 80]    Opinion Re: Motion for Summary Judgment              Appx6

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KENNETH MOSES,

      Plaintiff,

    v.

UNITED STATES STEEL CORPORATION,

      Defendant.

Civil Action No. 2:20-cv-752-RJC

Hon. Judge Robert J. Colville

**<u>NOTICE OF APPEAL</u>**

    Notice is hereby given that Plaintiff Kenneth Moses appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered on August 24, 2023. *See* ECF No. 82 (Judgment Order).

Respectfully submitted,

Dated: <u>September 1, 2023</u>

<u>*/s/ Hugh T. McKeegan.*</u>
Bruce C. Fox, Esq. (PA 42576)
Andrew J. Horowitz, Esq. (PA 311949)
Hugh T. McKeegan, Esq. (PA 325673)
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
(412) 566-1500 (Phone)
(412) 281-1530 (Fax)
bruce.fox@obermayer.com
andrew.horowitz@obermayer.com
hugh.mckeegan@obermayer.com

*Counsel for Plaintiff*

1

Appx3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH MOSES,

        *Plaintiff,*

    v.

UNITED STATES STEEL CORPORATION,

        *Defendant.*

Civil Action No. 2:20-cv-00752

Hon. William S. Stickman IV

## **JUDGMENT ORDER**

AND NOW, this __24__ day of August 2023, IT IS HEREBY ORDERED that pursuant to Federal Rule of Civil Procedure 58, judgment is entered in favor of Defendant United States Steel Corporation and against Plaintiff Kenneth Moses. The Clerk of Court is directed to mark this CASE CLOSED.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH MOSES,

          *Plaintiff,*

    v.

UNITED STATES STEEL CORPORATION,

          *Defendant.*

Civil Action No. 2:20-cv-752

Hon. William S. Stickman IV

## ORDER OF COURT

AND NOW, this __24__ day of August 2023, pursuant to the Memorandum Opinion filed this day, IT IS HEREBY ORDERED that Defendant United States Steel Corporation's Motion for Summary Judgment (ECF No. 58) is GRANTED.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Appx5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH MOSES,

        *Plaintiff,*

    v.

UNITED STATES STEEL CORPORATION,

        *Defendant.*

Civil Action No. 2:20-cv-752

Hon. William S. Stickman IV

### **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

    Plaintiff Kenneth Moses ("Moses") filed suit against United States Steel Corporation ("USS") for allegedly terminating his employment on the basis of his race. (ECF No. 1-3). Moses requests relief for violations of the Pennsylvania Human Relations Act ("PHRA") (Count I) and 42 U.S.C. § 1981 (Count II). Pending before the Court is USS's Motion for Summary Judgment. (ECF No. 58). For the reasons set forth below, USS's motion will be granted.

### I.    **Factual Background**

    USS is a large steel producer. (ECF No. 67, ¶ 1). Moses is an African American male who was initially hired by USS as a union snapper in the blast furnace at the Edgar Thomson Works in 2005. (*Id.* ¶¶ 22-24). For the first eight years of his employment with USS, Moses "had no significant discipline or safety issues." (*Id.* ¶ 26).[1] In 2013, Moses obtained the position of

---

[1] Though the parties do not dispute that Moses's first eight years of employment were "uneventful," the record demonstrates that between 2005 and 2013, Moses was disciplined on numerous occasions, albeit for relatively minor offenses. (ECF No. 67, ¶ 26). On May 31, 2005, Moses received a one-day suspension for "Absenteeism/Tardiness[.]" (ECF No 68-2, p. 118). On June 3, 2009, Moses received a five-day suspension subject to discharge for a verbal altercation with another employee. (*Id.*). On January 30, 2010, Moses received a five-day suspension for a

Operating Technician 1 – Labor Grade 3 in the Transportation Department.  (*Id.* ¶ 27).  In this capacity, he was "responsible for performing the pivotal role of locomotive operator, moving engines and railcars around the property by remote-control."  (*Id.* ¶ 28).  Shortly thereafter in July 2013, USS employees Amel Brown ("Brown") and Pierre Bien-Aime reportedly witnessed Moses "jump onto [a] locomotive while it was in motion."  (ECF No. 61-1, p. 134).  At the time, Brown was one of Moses's supervisors.  (ECF No. 73, ¶ 70).  For this alleged "potential cardinal rule violation," Moses received a ten-day suspension subject to discharge.  (ECF No. 61-12, pp. 3-4; ECF No. 68-2, pp. 115, 118; ECF No. 73, ¶ 79).  In December 2013, Moses was initially suspended for five days subject to discharge for an "[u]njustified absence on 12/24/13."  (ECF No. 68-2, p. 118; ECF No. 73, ¶ 87).  Moses's suspension was later reduced to three days.  (ECF No. 68-2, p. 118; ECF No. 73, ¶ 88).

In June 2014, supervisor Brown confronted Moses regarding his alleged failure to submit a required engine report.  (ECF No. 73, ¶ 90).  In his deposition testimony, Moses asserted that Brown shouted at him, accusing him of being "above the rules" and an "idiot."  (ECF No. 68-3, p. 22).  Moses stated that he "started walking away" from Brown, and that Brown "started following [Moses]" while "still yelling" at him.  (*Id.* at 22-23).[2]  A witness to the incident, Daniel Cain ("Cain"), provided a witness statement in which he wrote that Brown asked Moses, "why the fuck didn't you fill [the engine report] out."  (ECF No. 68-2, p. 105).  Cain continued, "as [Brown] started yelling[,] [Moses] got out of his seat and walked away trying to avoid confrontation with [Brown.]" (*Id.*).  Additionally, one of Moses's white colleagues, Adam O'Neill ("O'Neill"), provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has

---

"USS POLICY VIOLATION[.]"  (*Id.*).  On July 22, 2013, Moses received a one-day suspension for "[u]nsatisfactory work on 7/21/13[.]"  (*Id.*).

[2] USS disputes Moses's characterization of these events.  (ECF No. 73, ¶¶ 91-100).

2

been a[n] ongoing problem with just Kenny being [h]arrassed." (ECF No. 68-2, p. 106; ECF No. 73, ¶¶ 106, 107). O'Neill continued, "I … had multiple times been told to fax my engine report over without any punishment or harassment from the [] boss." (*Id.*). "At a 9(b) hearing, Brown admitted that he 'may have yelled' at Moses." (ECF No. 73, ¶ 108). The confrontation between Moses and Brown culminated in Moses being "immediately removed from the floor and suspended." (*Id.* ¶ 101).[3] USS's 9(b) hearing notes "indicate that Moses told [USS's] labor relations representative, Ashley Wissinger, that he felt he was being 'harassed' and that he accused Brown of being 'a racist.'" (*Id.* ¶ 109) (quoting ECF No. 68-2, p. 107). USS did not investigate Moses's allegations against Brown, though it denies that Brown harassed Moses. (ECF No. 73, ¶ 112). (*See also* ECF No. 68-11, p. 7).[4]

"In August 2014, Moses was again suspended, this time for failing to bump test his CO monitor." (ECF No. 67, ¶ 38).[5] "Two months later, in October 2014, Moses climbed up and over the coupler attaching two railroad cars[,]" resulting in "another five-day suspension, subject to discharge, which the Company later converted to a Last Chance Agreement" ("LCA"). (*Id.* at ¶¶

---

[3] Moses's disciplinary record shows a five-day Suspension Subject to Discharge for "Committing an Unsafe Act, 6/15/2014." (ECF No. 68-2, p. 118). A second disciplinary action for "Threatening Conduct Toward a Supervisor, 6/15/2014" was removed from Moses's record. (*Id.* at 117).

[4] USS has both a written Equal Employment Opportunity Policy ("EEO Policy") and a written Sexual and Discriminatory Harassment Policy. (ECF No. 61-1, pp. 46-52). The EEO Policy states in part, "[t]his policy includes recognition of an employee's right to work in an environment free from discriminatory harassment … [.]" (*Id.* at 46). The Sexual and Discriminatory Harassment Policy states that "discriminatory harassment is absolutely prohibited" and that "[m]anagement is responsible for conducting a prompt and appropriate investigation" in the event of a discriminatory harassment allegation. (*Id.* at 49, 51).

[5] According to USS, CO monitors "are designed to protect employees from toxic gas exposure and require [bump testing] before use." (ECF No. 59, p. 11). When asked about the significance of bumping one's monitor, Moses stated, "I don't know, I guess they – I don't know. They look at it as a safety, everybody is supposed to have a gas monitor on." (ECF No. 61-9, p. 9).

3

41, 45; ECF No. 68-2, p. 117; ECF No. 61-1, p. 3).[6] The LCA stated in relevant part that "[e]mployee understands that he must comply with all plant rules and regulations" and "that a failure to comply with all plant rules and regulations will result in suspension subject to discharge." (ECF No. 61-1, p. 3). The LCA was signed on April 22, 2015 by Krista Marcin, Department Manager – Labor Relations, Ross McClellan, Jr., USW District 10 Staff Rep., and Moses. (*Id.*). Around April 20, 2015, Moses returned to work. (ECF No. 73, ¶ 124).

The following incident resulted in Moses's discharge on December 4, 2015. (ECF No. 73, ¶ 156). "On November 24, 2015, Moses was pulling two railcars with a remote-controlled engine across the plant." (ECF No. 67, ¶ 51). "Later that shift, Moses had to change tracks by bringing the engine with the cars backward through a switch, throwing the switch once the engine and cars were through, and then moving them back through the switch onto another track." (*Id.* ¶ 53). As Moses conducted this maneuver, the train struck a derailer, causing "the lead wheels of the engine to go off the track." (ECF No. 73, ¶ 139). USS's incident report describes what occurred as follows:

> Train operator was in the process of taking 2 revert cars to the BOP and as the operator was coming down the foundry lead the operator attempted to stop the loco numerous times but the loco did not respond to the remote box which caused the loco to strike a derail and cause the rear wheels of the loco to go on the ground.

(ECF No. 61-1, p. 19). The report goes on, "Employee was not in proper position when bringing the loco down the track and did not operate at a safe speed." (*Id.* at 20). The parties vehemently contest the underlying facts of the November 24, 2015 incident. Specifically, they dispute whether the locomotive's brakes were working properly at the time of the incident, whether Moses was standing in the correct position as he moved the locomotive and accompanying cars, whether

---

[6] According to an email sent by Robert Williams ("Williams"), one of Moses's supervisors, Moses was previously "contacted" in April 2014 regarding this same safety rule. (ECF No. 61-1, p. 140).

Moses notified his supervisor in a timely manner, and whether he had the requisite control over the locomotive and accompanying cars when the derailment occurred. (ECF No. 73, ¶¶ 170-191; ECF No. 67, ¶¶ 50-89).

Moses initially received a five-day suspension subject to discharge for performing work in an unsafe manner. (ECF No. 73, ¶ 153). On December 4, 2015, USS converted Moses's suspension to discharge. (*Id.* ¶ 156). Through his union, Moses protested his termination and requested that his suspension be removed, his disciplinary record cleared, and that he be paid "all monies due." (ECF No. 68-2, p. 114). A step two hearing was held on January 5, 2016, with USS Labor Relations Representative Tegan Groves ("Groves") presiding. (*Id.*).[7] On January 29, 2015, Groves denied Moses's request. (*Id.* at 114-116). In her written opinion, Groves found that Moses had violated The Blast Furnace & Transportation Department Safety Rules, specifically rule RT-01. (*Id.*). Rule RT-01 states:

> Engineers, Conductors, and Train Operators shall be held responsible for violations of any rule concerning the safety and control of equipment in their charge and shall take every precaution for the protection of such equipment, even if not specifically provided by the rules.

(*Id.* at 115). Groves determined that "Moses failed to provide 'head end protection' and was not in the proper position when the train derailed." (ECF No. 73, ¶ 162) (quoting ECF No. 68-2, p. 116). According to Groves,

> RT-12 specifically states that Head End protection shall be provided in the direction of movement at all times and the operator can accomplish this by (1) preceding the lead car or locomotive on foot or (2) assuming a position which will enable them to see the area ahead of the lead car or locomotive.

---

[7] USS Labor Relations Representative Tegan Groves, Area Manager Mark Logoyda, Union Grievance Chairman Bob Morin, Union Grievance Representative Adam O'Neill, and Moses were in attendance. (ECF No. 68-2, p. 114).

(ECF No. 68-2, p. 116). Groves concluded that "Moses failed to provide head end protection based on her recollection of Moses's statement that 'once the locomotive came to a complete stop[,] he walked back to see how far it traveled and noticed the engine had derailed[.]'" (ECF No. 73, ¶ 164) (quoting ECF No. 68-2, p. 116). Groves viewed Moses's statement as "validating that he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive." (ECF No. 68-2, p. 116). Groves also wrote that Moses "stated that he applied the brakes and noticed that the engine was not stopping however the data recorder indicates that [Moses] never applied the brakes." (*Id.*). She further noted that "[a]ll equipment used during [the] incident was tested and proven to be functional." (*Id.*).

In upholding Moses's termination, Groves wrote, "[Moses] was properly disciplined and discharged for having performed an unsafe act. [Moses] operated a locomotive in a hazardous, uncontrolled manner. [Moses] should be in control of his locomotive at all times, but his negligence and reckless behavior resulted in an unsafe act." (*Id.*). Groves additionally took into consideration Moses's "lengthy discipline record." (*Id.*). After a step three hearing was conducted on March 11, 2016, the decision to terminate Moses was affirmed. (*Id.* at 120-122; ECF No. 73, ¶ 192).

On November 27, 2019, Moses commenced this action against USS in the Court of Common Pleas of Allegheny County, Pennsylvania, requesting relief for USS's alleged "disparate treatment in disciplinary procedures and termination because of his race." (ECF No. 1-3, p. 3; ECF No. 1-1, p. 1). USS removed the action to this court pursuant to 28 U.S.C. §§ 1441 and 1446. (ECF 1-1, p. 1).

## II. Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## III. Analysis

At Count I, Moses brings a PHRA claim, alleging that USS disciplined and terminated him because of his race. Moses further alleges that USS discriminated against him "by treating him differently than similarly situated non-African-American employees whom engaged in similar or worse conduct for which Moses's employment was allegedly terminated." (ECF No. 1-3, p. 8). At Count II, Moses brings a § 1981 claim, alleging the same.

"In the context of employment discrimination, PHRA and § 1981 claims are analyzed together, as they are 'governed by essentially the same legal standards.'" *Wolfgramm v. Commc'ns Workers of Am. Loc. 13301*, Civil Action No. 19-3701, 2022 WL 952634, at *5 (E.D. Pa. Mar. 30, 2022) (internal quotation omitted). The burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to claims of discrimination under both § 1981 and the

7

PHRA. *Barnes v. Nationwide Mut. Ins. Co.,* 598 F. App'x 86, 89 (3d Cir. 2015). This framework requires Moses to first establish "a prima facie case of racial discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802. If Moses is successful in establishing a prima facie case, "the burden then must shift to [USS] to articulate some legitimate, nondiscriminatory reason for [Moses's] rejection." *Id.* If USS succeeds, then Moses "must prove by a preponderance of the evidence that [USS's] purported legitimate reason is mere pretext." *Barnes,* 598 F. App'x at 89 (citing *McDonnell Douglas Corp.,* 411 U.S. at 804).

Under § 1981, "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* __ U.S. __, 140 S. Ct. 1009, 1014 (2020). "While the burden of production may shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bullock v. Child's. Hosp. of Philadelphia,* 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999) (quoting *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 253, (1981)).

### A. Moses has established a prima facie case

To establish a prima facie case of discrimination under § 1981 or the PHRA, Moses must show that "(1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to attain or retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Barnes,* 598 F. App'x at 89 (quoting *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008)). "The major purpose of the prima facie case is to 'eliminate the most obvious lawful reasons for the defendant's actions (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually

taken, etc.).'" *Bullock,* 71 F. Supp. 2d at 488 (quoting *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 352 (3d Cir. 1999)).

The parties do not dispute that Moses (1) was a member of a protected class; (2) was qualified for the position; and (3) suffered an adverse employment action. (ECF No. 67, ¶ 22; ECF No. 73, ¶¶ 133, 156; ECF No. 59, p. 4; ECF No. 66, p. 11, n. 9). However, USS argues that summary judgment should be granted in its favor because Moses cannot establish the fourth element of his prima facie case – an inference of unlawful, intentional discrimination. (ECF No. 59, pp. 4-9). Alternatively, USS argues that "Moses cannot identify any evidence supporting that USS fabricated its reason for terminating him." (ECF No. 59, p. 14).

"Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock,* 71 F. Supp. 2d at 487.[8] However, the plaintiff is not required to "make out a prima facie case with such evidence." *Id.* (citing *Pivirotto,* 191 F.3d at 356-357). *See also Anderson v. Wachovia Mortg. Corp.,* 621 F.3d 261, 269 (3d Cir. 2010) (citation omitted) ("Although comparative evidence is often highly probative of discrimination, it is not an essential element of a plaintiff's case."). Rather, a prima facie case "clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" *Pivirotto,* 191 F.3d at 356 (quoting *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, (1996)).

---

[8] In *Bullock,* the United States District Court for the Eastern District of Pennsylvania analyzed the claim before it only under Title VII. However, the court noted that its "analysis and conclusions are equally applicable to [Bullock's] claim of discrimination in violation of § 1981 and the PHRA." *Bullock,* 71 F. Supp. 2d at 485 (citing *Harris v. Smithkline Beecham,* 27 F.Supp. 2d 569, 576 (E.D. Pa. 1998)).

9

Because the parties do not dispute that the first three requirements for a prima facie claim have been met, the Court will focus its analysis on the fourth element -- whether Moses was fired under circumstances that could give rise to an inference of intentional discrimination. Moses relies heavily on his own largely unsubstantiated testimony to show that his employment was terminated on the basis of his race. Through his deposition testimony, Moses asserts that "[t]he whole environment [at USS] was uncomfortable" and "racist." (ECF No. 68-3, p. 16). Specifically, his testimony alleges that a number of racist remarks were made by various USS supervisors during his time at USS. [9] Such allegations, alone, however, do not suffice for purposes of establishing a prima facie case because "statements even by decisionmakers cannot constitute evidence if there is no evidence somehow linking that person to the actual employment decision." *Jones v. Sch. Dist. of Philadelphia,* 19 F. Supp. 2d 414, 420 (E.D. Pa. 1998), *aff'd,* 198 F.3d 403 (3d Cir. 1999); *see also Pivirotto,* 191 F.3d at 359) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight... [.]" (citation omitted)).

Although it is a close call, viewing the evidence in a light most favorable to Moses, the Court finds that an inference of intentional discrimination exists. It is undisputed that four of the six violations (dated 7/24/2013, 12/24/2013, and 6/15/2014 (two violations)) that occurred over the last two years of Moses's employment at USS were initiated by supervisors Brown and

---

[9] Though denied by USS, Moses testified that Jay Rosser, one of Moses's supervisors, stated that "black guys are always late," and joked, "what do you call a black man in a suit[?] ... a defendant." (ECF No. 68-3, pp. 7-8). Moses testified that, on a separate occasion, Brown told one of Moses's fellow black co-workers, "if a [b]lack guy can't go get water, what is he good for[?]" (*Id.* at 7). Moses further alleged that while he was training an individual, his colleagues told the individual that Moses was "teaching [him] ebonics." (*Id.*). Additionally, Moses testified that supervisor John Basista stated that more black individuals could not be hired because "they couldn't find anyone that wasn't on drugs or that [ ] didn't have a criminal background." (*Id.* at 13). Moses also testified that when Williams moved to a different area, he said that "he ha[d] less blacks in his neighborhood." (*Id.* at 7). Though not an exhaustive list of Moses's allegations, these assertions exemplify Moses's perception of the workplace environment at USS.

Williams (ECF No. 73, ¶ 130), both of whom Moses alleges made racist remarks in his presence. Moses's termination was predicated, in part, on his "lengthy discipline record," a record which Brown and Williams participated in developing. (ECF No. 68-2, p. 116; ECF No. 73, ¶ 187). Moreover, Moses's allegations of discriminatory conduct are bolstered by one of Moses's white colleagues, O'Neill, who provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has been a[n] ongoing problem with just Kenny being [h]arrassed." (ECF No. 68-2, p. 106). O'Neill continued, "I … had multiple times been told to fax my engine report over without any punishment or harassment from the [] boss." (*Id.*). Brown admitted that USS disciplined Moses for his failure to fax paperwork in a timely manner; the very act that O'Neill contends does not typically result in discipline. (ECF No. 68-11, p. 7). Furthermore, while O'Neill's statement makes no mention of race as a motivating factor, his belief that Brown "harassed" Moses gives credence to Moses's allegations of racial discrimination at USS.

After the June 15, 2014 altercation between Brown and Moses, USS's 9(b) hearing notes "indicate that Moses told [USS's] labor relations representative, Ashley Wissinger, that he felt he was being 'harassed' and that he accused Brown of being 'a racist.'" (ECF No. 73, ¶ 109) (quoting ECF No. 68-2, p. 107). USS did not investigate Moses's allegations against Brown even though its policy was to conduct "a prompt and appropriate investigation" in the event of a discriminatory harassment allegation. (ECF No. 61-1, p. 51; ECF No. 68-11, p. 7) (*see also* ECF No. 73, ¶ 112).[10]

At the prima facie stage, the Court will "presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Texas Dep't of Cmty. Affs*, 450 U.S. at 254 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). Given

---

[10] USS denies that Brown "harassed" Moses. (ECF No. 73, ¶ 112).

that establishing a prima facie case "'is not onerous' and poses 'a burden easily met,'" the Court finds that Moses has met his burden of establishing his prima facie case. *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Texas Dep't of Cmty. Affairs,* 450 U.S. at 253).

**B. USS has articulated a legitimate, non-discriminatory reason for Moses's termination**

USS has successfully articulated a legitimate, nondiscriminatory reason for Moses's termination. "The defendant need only produce evidence of one or more legitimate reasons, 'which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the adverse employment action.'" *Johnson v. Fed. Exp. Corp.,* 996 F. Supp. 2d 302, 318 (M.D. Pa. 2014), *aff'd,* 604 F. App'x 183 (3d Cir. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 502 (1993)). Moses not only had an extensive disciplinary history dating back to 2005, but was also on a LCA when he derailed a locomotive. The LCA plainly stated that failure to comply with USS's rules and regulations would result in suspension subject to discharge. (*See* ECF No. 61-1, p. 3). By its very nature, once Moses was placed on the LCA, he had one last chance to abide by USS's rules and regulations. According to USS, when he failed to do so, USS terminated his employment.

**C. Moses has failed to prove that USS's non-discriminatory reason for his termination was merely pretextual**

"A plaintiff may demonstrate pretext by presenting evidence from which a reasonable factfinder could 'either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Johnson,* 996 F. Supp. 2d at 319 (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)). As to the first prong,

the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes,* 32 F.3d at 765 (internal citations and quotations omitted). In other words, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones v. Sch. Dist. Of Philadelphia,* 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Keller v. Orix Credit All., Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997)). As to the second prong, the plaintiff "also may survive summary judgment by pointing to evidence in the record which 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes,* 32 F.3d at 764).

Moses argues that he has met his burden of establishing pretext through either prong of the *Fuentes* test. The Court disagrees.

Turning to the first prong, Moses contends that USS's "ultimate reason justifying the firing – that Moses failed to provide 'head end protection' – is false." (ECF No. 66, p. 20). Yet in her written opinion, Groves based her conclusion on Moses's own account of what occurred. In Moses's derailment statement, he wrote in part, "I proceeded to apply the brakes and notice[d] the engine not stopping so once it came to a complete stop I walked back to see how far it traveled being aware of the tight space and notice[d] the engine had derailed." (ECF No. 61-1, p. 151). RT-12 specifically states that head end protection shall be provided in the direction of movement at all times and the operator can accomplish this by (1) "preceding the lead car or locomotive on foot" or (2) "assuming a position which will enable them to see the area ahead of the lead car or

13

Appx18

locomotive." (ECF No. 68-18, p. 34). Groves viewed Moses's statement as "validating that he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive." (ECF No. 68-2, p. 116). Based on the record, the Court sees no error in Groves's assessment. Even if Groves's determination was flawed, "[i]t is not for the Court to sit as a super human resources department and re-examine [USS's] business decisions." *Frank v. PNC Fin. Servs. Grp., Inc.,* Civil Action No. 12-34, 2013 WL 4432857, at *8 (W.D. Pa. Aug. 15, 2013) (citation omitted). Moses cannot show that Groves's assessment was "so plainly wrong that it cannot have been [Groves's] real reason." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1109).

Next, Moses contends that Groves did not properly consider his claim that the remote he was using malfunctioned as he was attempting to change tracks with his locomotive. (ECF No. 66, p. 21). However, the record demonstrates that Groves relied on information relayed to her by Brad Horner ("Horner"), Todd McBride ("McBride"), and third-party experts in determining that "[a]ll equipment used during this incident was tested and proven functional." (ECF No. 68-2, p. 116).[11] Horner forwarded an email to Groves in which he stated "[f]ound air leak in unit which converts remote signal to air pressure in locomotive (however, air pressure read good)." (ECF No. 68-2, p. 134). Also, in Groves's handwritten notes, she wrote, "Todd McBride found oil in one of the manifolds" and that this "could [a]ffect train break" but that the oil in the manifold would "not [a]ffect [the] independent break (which is the engine break)." (*Id.* at 124). While the parties strongly dispute whether the remote was functioning properly on the day of the incident, Groves relied on information relayed to her by Horner and McBride to assure herself that the air pressure

---

[11] Horner was the Blast Furnace Coordinator. (ECF No. 67, ¶ 62). McBride was "one of [USS's] employees responsible for servicing the remote-control boxes." (ECF No. 73, ¶ 159).

in the unit was within its proper parameters and that Moses would still have had the option to stop the locomotive with the independent break if the train break proved faulty. Moreover, it is undisputed that "[b]y the time of the Step 3 hearing, third-party experts retained by USS had tested the remote-control box and verified that all equipment was fully functioning." (ECF No. 67, ¶ 78). The remote was tested three days prior to Groves's written step two minutes and was found to be "operating 100%." (ECF No. 68-2, p. 90). Nothing in the record would lead a reasonable factfinder to believe that USS's determination that the remote was properly functioning should be "unworthy of credence." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1108).

Moses additionally takes issue with Groves's assertion that he neglected to stop and promptly call his supervisor once the derailment occurred. (ECF No. 66, p. 21). But here too, the record reflects that Horner emailed Groves stating, "[t]he event recorder showed throttle changes and/or brake air pressure changes during the time of the derailment. Throttled up for approximately 40 seconds trying to move[ ] forward after being derailed per event recorder and engine was physically moved 6-8 feet back through the derail." (ECF No. 68-2, p. 136). Horner also testified that when he watched the video of the derail, he witnessed Moses "change[ ] the direction of travel and move[] the train after the derailment." (ECF No 61-8, p. 8). When asked if moving a train after a derail was improper, Horner responded, "Yes … [b]ecause you're not supposed to move equipment after an incident." (*Id.*). In the minutes from the step two hearing, Groves wrote,

> Grievant did not comply with the Stop and Act rule requiring employees to access the situation, consider alternatives and then take appropriate action including communication with co-workers and supervision. Grievant knew that he derailed and he should have stopped and called his supervisor immediately. However, Grievant throttled up for approximately 40 seconds trying to move forward after being derailed and the engine was moved 6-8 feet back through the derail.

(ECF No. 68-2, p. 116). Moses, however, discounts Groves's account by pointing to wholly unrelated incident reports involving other USS employees which, according to Moses, "indicate

15

that proper notice was given even though the employees involved only belatedly noticed a train had derailed." (ECF No. 66, p. 21) (citing ECF No. 61-1, pp. 60, 85, 110). Yet the descriptions of each of these instances show that once the employees noticed that car(s) had derailed, they notified their supervisor prior to taking any further action. An incident dated July 1, 2016, was described as follows:

> Trestle crew had just coupled into a string of ore cars to bring to the trestle to dump. The loco operator was given the command to draw back by the groupleader and the loco attempted to pull back without success. The groupleader then walked back to check for applied brakes when he noticed 4 cars that were derailed. All appropriate personnel were notified at this time.

(ECF No. 61-1, p. 60). Even though the employee "only belatedly noticed a train had derailed" (ECF No. 66, p. 21), the employee did not attempt to move the train after the incident, but rather notified personnel upon realizing that a derailment had occurred. Similarly, an incident dated December 28, 2016, was described as follows:

> The train operator was in the process of pulling two empty ladles down Mixer Hill with locomotive ET1 after they had just been dumped into the Mixer. While riding on the front of the locomotive and after travelling approximately 50 yards, he began to experience difficulty pulling the ladles and stopped the train to investigate. At this time, he noticed that both sets of rear trucks on ladle 16 (the last ladle in the train" were derailed. He then notified supervision of the incident.

(ECF No. 61-1, p. 85). Again, in this instance, once the derail was confirmed, the employee notified his supervisor of the incident and did not try to move the train after the incident. Lastly, on October 7, 2015, an incident occurred wherein a car derailed, and upon noticing the derail, the employee notified appropriate personnel. (*Id.* at 110). These incident reports make clear that timely notice was given once each derailment occurred. Yet Moses's incident report makes no mention of notice whatsoever. (*See* ECF No. 68-2, p. 91). Therefore, Moses cannot use these separate derailment incidents to show that he gave proper notice to his supervisors, nor can he use them to discount Groves's determination to the contrary.

16

Groves relied upon Horner's interpretation of what transpired on November 24, 2015 to conclude that Moses did not provide proper notice to his supervisor. Horner's understanding of what occurred that day was predicated upon watching the video of the derailment and looking at the event recorder data. Moses's testimony to the contrary is not probative of pretext. Thus, Moses has not met his burden of demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Jones,* 198 F.3d at 413 (quoting *Keller,* 130 F.3d at 1108).

Moses additionally points to the fact that "Groves'[s] decision failed to consider that the derailer was not properly marked on the day of the incident." (ECF No. 73, ¶ 170; ECF No. 66, p. 21).[12][13] However, the omission of this fact from Groves's step two minutes does not give rise to the conclusion that USS's justification for terminating Moses was pretextual in nature. As Moses concedes, his failure to provide head end protection was USS's "ultimate reason justifying [his] firing." (ECF No. 66, p. 20). Though he believes this justification to be false, Groves's failure to include any mention of the presence, or lack thereof, of a flag by the derailer, does not amount to evidence from which a factfinder could reasonably disbelieve USS's articulated legitimate reasons for Moses's discharge.

---

[12] According to Dr. Allan M. Zarembski, who was hired by Moses's law firm, it is industry practice to mark derailers with a flag for visibility. (ECF No. 68-18, p. 3; ECF No. 73, ¶ 169).

[13] Notably, in his deposition, Moses testified, "I knew the derailer was there because of my job. You understand? Like I knew where derails, where certain switches and things are. You understand? It would have never hit that derailer if the box would have worked correctly. Never hit it." (ECF No. 68-3, p. 27). Thus, by Moses's own admission, the absence of a blue flag in close proximity to the derailer had no effect on the derail.

Lastly, Moses argues that Brown's involvement in USS's decision to terminate him shows that discrimination was a determinative factor in his firing because of Brown's alleged biased conduct and statements. (ECF No. 66, p. 22). While the evidence demonstrates that Brown may not have liked Moses, the record is completely devoid of any evidence, aside from Moses's own bare assertions, showing that Brown's bias, if any, was predicated upon his race.[14]

The United States Court of Appeals for the Third Circuit's decision in *Jones* affirming the dismissal at summary judgment of § 1981 and PHRA claims brought on the basis of race discrimination and retaliation is instructive.[15] Charles Jones ("Jones"), an African American former teacher of physics, chemistry and biology, was employed with the School District of Philadelphia from 1985 to 1995. *Jones,* 198 F.3d at 406. In 1995, he resigned from the school district, claiming that "he would be terminated involuntarily unless he did so." *Id.* [16] In granting the school district's motion for summary judgment, the United States District Court for the Eastern District of Pennsylvania delved into Jones's disciplinary record. In sum, the district court found that

> [w]hile there is ample evidence in the record that plaintiff was the recipient of
> numerous disciplinary memoranda and unsatisfactory classroom evaluations and

---

[14] Moses testified that he overheard Brown tell a fellow African American USS employee, "if a Black guy can't go get water, what['s] he good for." (ECF No. 68-3, p. 7). While there is corroborating evidence showing that Brown may not have liked Moses, nothing in the record apart from Moses's own testimony demonstrates that Brown was *racially* biased towards him. On the contrary, Michael Carter, a fellow African American USS employee, testified that Brown would treat "a black guy bad and a white guy bad," and that Brown "didn't treat [Moses] like he treated me … [Brown] didn't like [Moses] or something for some reason." (ECF No. 61-15, p. 3; ECF No. 68-10, p. 4).

[15] Jones also brought claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq,* and Pa. Stat. Ann. Tit. 43, §§ 951 *et seq. Jones,* 198 F.3d at 406.

[16] Even though Jones was not fired, the Third Circuit found that he had established a prima facie case for constructive discharge under § 1981 because "his involuntary transfer to two schools and the second school's failure to assign him the physics roster despite his qualifications, was sufficient to establish a prima facie case under section 1981." *Id.* at 412.

that his interpersonal skills, teaching and coaching techniques were criticized by the principals and vice principals of the three high schools at which plaintiff taught, there simply is no evidence that any of these criticisms, unfavorable evaluations or disciplinary/remedial actions resulted from any racial animus or discrimination on the part of the school district. Although Mr. Jones relies in large measure on Northeast Principal Hoban's alleged racial bias as reflected by his reference sometime in 1990 to an african-american student as a "black princess" and his membership in an all male, nearly all white school-affiliated club, he has produced no evidence that Mr. Hoban bore **him** any racial bias, that it was because of this racial bias that plaintiff was administratively transferred from Northeast High School, or that Hoban played any role in Edison High School Principal Torres' ultimate recommendation to terminate him.

*Jones,* 19 F. Supp. 2d at 419 (emphasis in original). The Philadelphia school district contended that Jones was transferred and threatened with termination "because of repeated instances of improper conduct," which it supported with "ample evidence of numerous parental complaints about plaintiff's teaching and coaching techniques, unsatisfactory classroom reviews, and disciplinary and warning memoranda generated over the course of plaintiff's ten-year teaching career." *Id.* at 420. The Third Circuit found that there was "insufficient evidence to support the claim of pretext[,]" noting that "Jones makes numerous allegations in his affidavit which he predicates on nothing more than his beliefs without having actual knowledge of them." *Jones,* 198 F.3d at 414. In affirming the district court's determination, the Third Circuit found that Jones's Title VII and PHRA claims "should have survived the initial stage of the *McDonnell Douglas* analysis," but nevertheless failed at the pretext stage. *Id.* at 412. Similarly, the Third Circuit affirmed the district court's order for summary judgment on Jones's § 1981 claim. *Id.* at 415.

Moses's position as to Brown is analogous to Jones's position as to Principal Hoban. Jones argued that Principal Hoban "repeatedly targeted him for harassment because of his race" and that "Hoban disciplined Jones several times during his employment at NEHS." *Id.* at 406. In determining that Jones had to be administratively transferred, Assistant Principal Alvin Vaughn relied, in part, upon "an SEH-204 [a type of formal disciplinary action] dated January 6, 1993,

from Principal Hoban." *Id.* at 408. Yet the district court found that Jones had failed to produce sufficient evidence to show that Principal Hoban "played any role in Edison High School Principal Torres' ultimate recommendation to terminate him." *Jones,* 19 F. Supp. 2d at 419. Here too, Moses has failed to show that Brown played a role in USS's determination to discharge him.

Moses points to the fact that Brown was "copied on emails regarding the derailment" and his testimony that he "'probably' talked to Groves about Moses" to show Brown's involvement in his termination. (ECF No. 66, pp. 17-18).[17] However, Brown's testimony regarding "probably" speaking to Groves is absent from the record before the Court. Left only with the fact that Brown was copied on emails regarding Moses's derailment, such scant evidence connecting Brown to the derailment and subsequent discharge of Moses does not suffice for purposes of establishing pretext.

Giving Moses the benefit of the doubt, the Court will presume that Brown testified to "probably" talking to Groves about Moses. Still, Moses has failed to establish that any animus Brown may have had towards him was predicated upon his race, and the record is replete with evidence to the contrary. Moreover, it is undisputed that "none of [USS's] representatives – including [Mark] Logoyda who hired Moses – objected to Moses's termination." (ECF No. 67, ¶ 82). Thus, Brown's involvement, if any, with Moses's termination does not "establish some causal nexus" between Moses's termination and his race. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 798 (3d Cir. 2003).

---

[17] Brown's testimony suggests that he did not know that Moses was terminated because of the derailment. (*See* ECF No. 61-11, pp. 3, 13). However, the record makes clear that he was copied on emails relating to the derailment. Considering the evidence in a light most favorable to Moses, the Court will not give Brown's testimony any weight as to this issue.

Turning to whether Moses demonstrated pretext by "presenting evidence from which a reasonable factfinder could ... (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action[,]" the Court finds that Moses has not met his burden. *Johnson,* 996 F. Supp. 2d at 319 (quoting *Fuentes,* 32 F.3d at 764).

Moses highlights the June 15, 2014 altercation that he had with Brown to show that he was "singled out by his supervisors for discipline based on his race and that this caused his termination." (ECF No. 66, p. 20). Indeed, O'Neill, one of Moses's white colleagues, provided a written statement saying, "[t]his problem with Kenneth Moses and Sonny Brown has been a[n] ongoing problem with just Kenny being [h]arrassed." (ECF No. 68-2, p. 106). Notably, O'Neill's statements made no mention of race. While such evidence was sufficient to establish his prima facie case, at the pretext stage, Moses needs more.

When asked whether "there was anyone being treated differently because of their skin color[,]" Michael Carter ("Carter"), a fellow African American USS employee, testified,

> I can't say that, ... when I see some – some bosses are -- I don't know how to say this cordially, but they're just assholes; ... That's just basically what it is. They treated a black guy bad and a white guy bad. You know, like, I can't say it had nothing to do with – like, they were just assholes to everybody, in my opinion, that's how I looked at it.

(ECF No. 61-15, p. 3). When asked if Brown fell into this category, Carter responded,

> Oh, most definitely ... if you ever worked for somebody who was not that bright, and arrogant, it's a bad combination. I could work for somebody that's not that bright because I knew my job. I could work with somebody that's arrogant because I knew my job. But when you put that combination together, it's a bad combination, in my opinion.

(*Id.* at 3-4). Carter was then asked whether Brown "was both of those things[,]" to which Carter responded, "[t]o me, he was." (*Id.* at 4). Later, Carter was asked if Brown treated Moses the same way that he was treated. Carter answered, "No, he didn't treat Kenny like he treated me. He was

– him and Kenny, I don't know what they had going on, but it's, like, he didn't like Kenny or something for some reason." (ECF No. 68-10, p. 4). Moses cannot rely on Carter's testimony to show that the "reason" for Brown's differing treatment of Moses must have been his race given that Brown treated Carter, an African American employee, differently than he treated Moses. The record demonstrates that Moses and Brown simply did not get along. As in *Jones*, "there simply is no evidence that any of these criticisms, unfavorable evaluations or disciplinary/remedial actions resulted from any racial animus or discrimination …[.]" *Jones,* 19 F. Supp. 2d at 419.

Moses points to several of his previous disciplinary events to show that discrimination permeated his record at USS. First, Moses refers to his violation for committing an unsafe act on July 24, 2013. The notes from Moses's 9b hearing reflect that he admitted to "stepp[ing] onto the step" of the locomotive while the locomotive was "still moving." (ECF No. 61-1, p. 138).[18] While the parties dispute whether Moses stepped on or off of the moving locomotive, by Moses's own admission, stepping on or off of a moving locomotive is a USS safety violation. (ECF No. 68-3, p. 14). In addition, Moses testified that the locomotive "might have shifted from the brakes" as he got off. (*Id.*). Thus, there is insufficient evidence to support the proposition that Moses's discipline was predicated upon his race, a burden that Moses bears. Moreover, Moses's bare assertion that supervisors "look[ed] the other way" when white employees stepped off of moving locomotives does not give rise to an inference of discrimination. (ECF No. 68-3, p. 15).

Next, Moses argues that he "was disciplined for climbing over a coupler and put on an LCA [when] another employee performing the same act was not." (ECF No. 66, p. 20; ECF No. 73, ¶¶ 125-127). Yet, Moses provides no evidence to show that the other employee had a similar

---

[18] Contrary to USS's 9b hearing notes, Moses testified that he "was getting off of [the locomotive]" rather than stepping onto it. (ECF No. 68-3, p. 14).

disciplinary record when he climbed over the coupler. In fact, Moses does not point to any evidence showing that the employee in question was similarly situated in any way aside from also stepping over a coupler. Instead, Moses points to USS's Response No. 13 to Plaintiff's First Set of Requests for Admissions. In Request for Admission No. 13, Moses asserted that "In 2016, U.S. Steel did not discipline any employee of the Edgar Thompson Works a 5 day suspension for climbing over a coupler." (ECF No. 68-14, p. 14). USS responded in relevant part, "it did not suspend any employee of the Edgar Thompson Works for five days solely 'for climbing over a coupler' in 2016." (*Id.*). USS continued, "Any discipline given in 2016 was determined based on the specific circumstances surrounding the employee's conduct and disciplinary record...." (*Id.*). When Moses climbed over the coupler on October 23, 2014, he already had ten offenses on his disciplinary record. (ECF No. 73, ¶ 128).[19] USS's response to Moses's Request for Admission No. 13 is consistent with its decision to put Moses on a LCA given his extensive disciplinary history and the severity of the infraction. Both Williams and Horner testified to the gravity of Moses's infraction. Williams, who witnessed Moses climb over the coupler and suspended him for doing so, stated that Moses "took a life-threatening shortcut" and showed a "lack of judgment." (ECF No. 61-13, p. 5). Similarly, Horner stated that climbing across a coupler "put [Moses's] life in jeopardy" and was "an extremely unsafe act" such that no circumstance would justify doing so. (ECF No. 61-8, p. 3-4). Nothing in the record demonstrates that Moses was unfairly disciplined because of his race when he stepped over the coupler. On the contrary, the record shows that Moses admitted that he stepped over the coupler and that doing so was a safety violation. (ECF

---

[19] One of Moses's disciplinary offenses -- Threatening Conduct Toward a Supervisor, 6/15/2014 -- was removed from his disciplinary history. (ECF No. 68-2, p. 117).

No. 61-9, p. 15). Moses's series of safety violations with no sign of improvement constituted a legitimate reason for USS to place Moses on an LCA.

Similarly, Moses alleges that he was the only USS employee to be discharged after causing a derail. (ECF No. 66, p. 20). Moses points to USS's supplemental answer to Plaintiff's Interrogatory No. 12 in which USS represented that only three employees received discipline for causing derailments out of some twenty-five derailments spanning 2015 and 2016. (ECF No. 68-14, pp. 2-3; ECF No. 68-2, pp. 139-202). USS responded in part,

> the following individuals were disciplined related to the reported derailments: Jason Grimes (white - 3-day suspension) and Brian Pollack (white - 3-day suspension). Michael Sauritch (white) received a 1-day suspension that was ultimately dropped. Those individuals who were otherwise identified in USS4420USS505 as being involved in the subject derailments did not receive discipline for those derailments.

(ECF No. 68-14, p. 3). Moses admits that these white employees were not on LCAs when the derailments occurred. (ECF No. 66, p. 20). While Moses downplays this fact, its importance should not be understated. As Groves's step two minutes illustrate, Moses was not terminated solely on the basis of his derailment, but also because of his "lengthy disciplinary record" and LCA. (ECF No. 68-2, p. 116). Moreover, the fact that the three other individuals who were disciplined for derailments - Jason Grimes, Brian Pollack and Michael Sauritch - were Caucasian, cuts against Moses's position. Moses has failed to establish that any of the other USS employees responsible for derailments had similar disciplinary histories. Compartors "must be similar to [the] plaintiff in 'all relevant aspects.'" *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011)). Here, Moses stands in stark contrast to his peers. USS had the right to treat him as such.

## IV.    Conclusion

24

"Overall, the circumstances of this case which [the Court has] already [ ] described in detail reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive law suit." *Jones*, 198 F.3d at 414. The record demonstrates that USS gave Moses a multitude of chances to improve and learn from his prior violations. Moreover, during his first eight years with USS, Moses was promoted up the ranks, with each promotion coming with additional responsibilities. And when Moses wanted to leave the blast furnace department, USS allowed him to transfer to the transportation department as an Operating Technician I. It is no coincidence, and Moses does not dispute, that during this period, "he had no significant discipline or safety issues." (ECF No. 67, ¶ 26). Just as USS rewarded Moses for his ability to follow USS's rules and regulations during his first eight years, it also disciplined him for violating them in his last two years and was within its right to do so. These violations were not trivial in nature, but rather, carried with them clear risks to life and limb. The gravity and numerosity of these violations culminated in Moses's discharge. USS's position that it fired Moses because he derailed a locomotive while on a LCA is supported by an abundance of evidence; evidence which Moses has failed to demonstrate is merely a pretext for discrimination. Therefore, the Court finds that summary judgement is warranted on Moses's PHRA and § 1981 discrimination claims. Summary Judgment will be granted in favor of USS. Orders of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

8-24-23
Date