**No. 23-2605**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

KENNETH MOSES,

*Plaintiff-Appellant,*

v.

UNITED STATES STEEL CORPORATION,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the Western District of Pennsylvania
No. 2:20-cv-00752-WSS
Hon. William S. Stickman IV, U.S.D.J.

---

## APPELLEE UNITED STATES STEEL CORPORATION'S
## RESPONSE BRIEF

---

Marla N. Presley (PA No. 91020)
marla.presley@jacksonlewis.com
Laura C. Bunting (PA No. 307274)
laura.bunting@jacksonlewis.com
Daniel F. Thornton (PA No. 318431)
daniel.thornton@jacksonlewis.com
**JACKSON LEWIS P.C.**
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
412-232-0404

*Counsel for United States Steel
Corporation*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Appellee United States Steel Corporation makes the following disclosures:

1.      For non-governmental corporate parties, please list all parent corporations: **None.**

2.      For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock: **None.**

3.      If there is a publicly held corporation that is not a party to the proceeding before this Court but that has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests: **None.**

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................... vi

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................1

CONCISE STATEMENT OF THE CASE .....................................................1

    I.       RELEVANT FACTUAL BACKGROUND...........................................1

        A.     USS strives to be the world's best steel company. .....................1

             1.      USS's robust workplace policies prohibit discrimination and provide multiple avenues to report it..............................................................................1

             2.      In addition to its commitment to a workplace free from discrimination and harassment, safety is a top priority at the USS plants..................................................3

             3.      Given the need for employees to abide by safety measures, USS utilizes progressive discipline for its union employees who violate its rules, policies, and procedures........................................................................4

        B.     Moses's tenure with USS belies any finding that the Company considered his race during the disciplinary process.......................................................................................6

             1.      USS hired Moses in 2005 knowing he is black, and trained him on USS's safety policies, including its Cardinal Rules, to make him successful...........................6

TABLE OF CONTENTS CONTINUED

       2.    Despite USS's efforts to maintain a safe workplace for its employees through regular trainings, Moses committed several workplace safety violations resulting in a Last Chance Agreement mere months before his final safety violation. ........................................7

       3.    Despite the ample warnings and repeated chances to fix his dangerous ways, Moses derailed a train while on a Last Chance Agreement that resulted in his termination. ....................................................................10

       4.    After the Company upholds his dismissal, Moses claims for the first time his termination was because of his race ........................................................................17

    C.    At Edgar Thomson Works in Braddock, employees of all races are treated equally, which is demonstrated by USS's reasonable decision to terminate Moses after an investigation confirmed he caused the derailment ....................18

II.     RELEVANT PROCEDURAL HISTORY ............................................21

III.    RULINGS PRESENTED FOR REVIEW ............................................21

SUMMARY OF ARGUMENT .................................................................24

ARGUMENT ...........................................................................................25

I.      THE DISTRICT COURT CORRECTLY CONCLUDED THAT MOSES FAILED TO DEMONSTRATE PRETEXT BY PRESENTING EVIDENCE UNDERMINING USS'S LEGITIMATE REASONS .................................................................25

    A.    Standard of review. ..................................................................25

    B.    Standard for demonstrating pretext through evidence undermining the employer's articulated legitimate reasons. ...................................................................................26

    C.    Moses admitted in writing that he failed to provide Head End Protection for his locomotive. ...........................................28

TABLE OF CONTENTS CONTINUED

D.    Moses presented no competent evidence that USS's decision makers had reason to believe his equipment malfunctioned..................................................................29

E.    Moses presented no competent evidence to rebut the video and event-recorder evidence showing that he moved his train after the derail. ...................................................31

F.    Moses admitted that the derailer's flagging played no role in the derail.............................................................33

II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT MOSES FAILED TO DEMONSTRATE PRETEXT BY PRESENTING EVIDENCE OF INVIDIOUS DISCRIMINATION ...........................................................33

A.    Standard of review. ...................................................33

B.    Standard for demonstrating pretext through evidence of individious discrimination. ......................................34

C.    Moses failed to identify any comparators.................34

D.    Moses failed to establish that Brown played any role in USS's decision to terminate him...............................36

E.    Even if Brown had played a role in the decision, Moses failed to establish that Brown influenced the other decision-makers. ...................................................37

F.    Even if Brown had played a role in the decision, Moses failed to establish that Brown was racially biased against him...............................................................38

G.    Moses's attacks on his prior discipline are unavailing. ............40

    1.    Moses admitted to stepping onto a moving locomotive in July 2013. ................................41

    2.    Moses failed to identify any proper comparators for the June 2014 incident. ...................................42

TABLE OF CONTENTS CONTINUED

3. Moses failed to identify any proper comparators for the August 2014 incident. ................................................. 43

4. Moses admitted to climbing over a coupler in October 2014. .................................................................... 43

5. Moses voluntarily accepted USS's offer of a Last Chance Agreement. ........................................................ 44

H. Contrary to Moses's contentions, the District Court did not apply a "pretext plus" standard. ................................................ 47

CONCLUSION ......................................................................................... 51

COMBINED CERTIFICATE OF COMPLIANCE ................................................. 52

CERTIFICATE OF SERVICE ................................................................. 53

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 17 (E.D. Pa.),
   *aff'd*, 401 F. App'x 697 (3d Cir. 2010) .................................................40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................26

*Barnes v. Nationwide Mut Ins. Co.*, 598 F. App'x 96, 89 (3d Cir. 2015) ..............27

*Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 608 (W.D. Pa. 2019) .......28

*Bullock v. Child's. Hosp. of Philadelphia*, 71 F. Supp. 2d 482,
   487 (E.D. Pa. 1999) ...................................................................... 27, 44

*Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986) .................................................26

*Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066 (7th Cir. 2003)..................................37

*Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015)........35

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016) .............25

*El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007)................................26

*Frank v. PNC Fin. Servs. Grp., Inc.*, No. 12-cv-34,
   2013 WL 4432857, at *8 (W.D. Pa. Aug. 15, 2013)...........................................40

*Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994) ............................................... *passim*

*Golson-El v. Runyon*, 812 F. Supp. 558, 561 (E.D. Pa. 1993) ................................46

*Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995)..........39

*Green v. United States Steel Corp.*, No. 2:05-cv-213,
   2006 U.S. Dist. LEXIS 75236, at *15-16 (N.D. Ind. Oct. 12, 2006)...................46

vi

TABLE OF AUTHORITIES CONTINUED

*Hicks v. Arthur*, 878 F. Supp. 737 (E.D. Pa. 1995) ...................................28

*Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238,
   241 (3d Cir. 2011) .................................................................................39

*In re. Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018).........................35

*Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 319 (M.D. Pa. 2014) ..........27

*King v. City of New Kensington*, Civ. No. 06-cv-1015,
   2008 U.S. Dist. LEXIS 76485, *44-48 (W.D. Pa. Sept. 30, 2008).....................39

*McClung v. Songer Steel Servs., Inc.*, 1 F. Supp. 3d 443,
   452 (W.D. Pa. 2014) .......................................................... 34, 35, 42, 43

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................ 26, 27, 50

*McKenna v. City of Phila.*, 649 F.3d 171, 172, 177-180 (3d Cir. 2011) ................38

*Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004).......................35

*Nicholson v. W. Penn Allegheny Health Sys.*, No. 06-cv-0814,
   2007 U.S. Dist. LEXIS 78566 (W.D. Pa. Oct. 22, 2007)....................................46

*Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) ....................35

*Parish v. UPMC Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608,
   628 (W.D. Pa. 2019) .......................................................................... 34, 37

*Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 596 (E.D. Pa. 2019) ...........28

*Pivirotto v. Innovative Sys.*, 191 F.3d 344, 359 (3d Cir. 1999) ...............................39

*Shaw v. Temple Univ.*, No. 16-cv-5567, 357 F. Supp. 3d 461,
   479 (E.D. Pa. Jan. 11, 2019).................................................................45

*Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011)..................................................38

*Sterrett v. Giant Eagle, Inc.*, 681 Fed. App'x 145, 151 (3d Cir. 2017)...................38

*Taylor v. Cherry Hill Bd. of Educ.*, 85 F. App'x. 836, 839 (3d Cir. 2004) ............42

*Texas Dep't of Cmty' Affs. v. Burdine*, 450 U.S. 248, 253 (1981) .........................27

TABLE OF AUTHORITIES CONTINUED

*Walden v. Georgia-Pacific Corp.*, 126 F. 3d 506, 521 (3d Cir. 1997) ....................39

*White v. Aldridge Elec., Inc.*, Civ. No. 5:21-cv-01872,
    2022 U.S. Dist. LEXIS 62109, *16 (E.D. Pa. Apr. 4, 2022) ...............................39

*Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) ......................34

*Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638,
    645 (3d Cir. 2015) .............................................................................................34

*Wolfgramm v. Commc'n Workers of Am. Local 13301*, No. 19-cv-3701,
    2022 U.S. Dist. LEXIS 57915, *11 (E.D. Pa. Mar. 30, 2022) ..................... 26, 34

## Other Authorities

42 U.S.C. § 1981 ......................................................................................................17

Pennsylvania Human Relations Act, 43 P.S. §§ 951 to 963 ("PHRA")..................17

## Rules

Fed. R. Civ. P. 56(a)...............................................................................................26

## JURISDICTIONAL STATEMENT

Appellee United States Steel Corporation ("USS" or the "Company") adopts Appellant Kenneth Moses's ("Moses's") Jurisdictional Statement. (Appellant's Br. at 4-5.)

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court correctly concluded that Moses failed to demonstrate pretext by presenting evidence from which a reasonable factfinder could disbelieve USS's articulated legitimate reason for its action? (Appx17-25.)

2.    Whether the District Court correctly concluded that Moses failed to demonstrate pretext by presenting evidence from which a reasonable factfinder could believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of USS's action? (Appx26-29.)

## STATEMENT OF RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings.

## CONCISE STATEMENT OF THE CASE

## I.    RELEVANT FACTUAL BACKGROUND

### A.    USS strives to be the world's best steel company.

#### 1.    USS's robust workplace policies prohibit discrimination and provide multiple avenues to report it.

USS is a leading steel producer operating plants around the world. With tens of thousands of employees, it maintains robust policies safeguarding equal

employment opportunity while prohibiting harassment and discrimination, including based on race. (*See* USS EEO, Harassment, and Discrimination Policies, Appx132-138; Basic Labor Agreement ("BLA"), Appx204-205.)

As part of this commitment to equal opportunity, USS gives employees its policies and training to ensure that they understand the Company's rules and expectations. (Deposition of Tegan Groves ("Groves Dep."), Appx252:18-25; Deposition of Rebecca Bloom ("Bloom Dep."), Appx268:24-25, Appx269:9-270:18, Appx271:13-272:14; BLA, Appx206-207.)

Understanding that employees may face issues with even the most comprehensive policies, USS has multiple avenues to report concerns, including any discrimination in the workplace. These channels allow employees to make reports to any manager or labor representative, or through USS's ethic hotline (available by phone, online, e-mail, and mail). (Appx137; Groves Dep., Appx253:4-15, Appx254:8-256:10.)

In line with its relationship with its labor union, USS also has Civil Rights Committees at its locations comprised of union representatives and labor representatives from USS, allowing employees to have union representation when reporting instances of discrimination and harassment. (Deposition of Krista Marcin ("Marcin Dep."), Appx275:15-20; BLA, Appx206-207.)

And to ensure that employees can promptly make reports, posters are placed throughout USS's plants reminding employees how to raise suspected instances of discrimination or harassment.  (Groves Dep., Appx256:2-17.)

Despite being advised of USS's strong anti-discrimination policies and reporting avenues many times during his long tenure with the Company, Moses failed to avail himself of them until he filed suit long after his termination.  (Groves Dep., Appx252:18-25, Appx253:4-15, Appx254:8-256:10, Appx256:2-17; Bloom Dep., Appx268:24-25, Appx269:9-270:18, Appx271:13-272:14; Marcin Dep., Appx275:15-20; Deposition of Kenneth Moses ("Moses Dep."), Appx329:22-330:4; Appx370-371.)

> ### 2.    In addition to its commitment to a workplace free from discrimination and harassment, safety is a top priority at the USS plants.

Given the dangerous nature of steel mill work—including working with heavy moving equipment, molten metal, and toxic fumes—employee safety is paramount. (Deposition of Mark Logoyda ("Logoyda Dep."), Appx289:9-22.)

To minimize accidents and injuries, the Company's policies detail the safety risks of the workplace, the inherent dangers of working with steel and railroad equipment, and the ramifications of failing to follow the rules.  (Appx214-215.)

On top of that, the blast furnace has its own set of Cardinal Rules governing employees who work in the area where metal is smelted and moved. (Appx215; Deposition of Jodi McCallister ("McCallister Dep."), Appx298:1-5.)

These Cardinal Rules are distributed to all employees, who then receive related training to ensure that safety procedures are always followed. (Appx215; Def's Ans. to Pl's First Interrog. No 4, Appx305.)

### 3. Given the need for employees to abide by safety measures, USS utilizes progressive discipline for its union employees who violate its rules, policies, and procedures.

Balancing its need for strict adherence to safety practices with its goal of ensuring an equitable workplace, USS has progressive discipline commensurate with the severity of violation or infraction. (Groves Dep., Appx252:1-4, Appx257:24-258:23; McCallister Dep., Appx295:22-296:7, Appx297:5-25, Appx298:6-14.)

Under the progressive discipline structure, employees are typically issued a written warning, then a one-day suspension, followed by a three-day suspension, and then a five-day suspension, depending on the policy violation and the employee's disciplinary history. (Groves Dep., Appx257:13-258:5.)

But given USS's commitment to protecting its employees and the community, safety infractions are always penalized with a five-day suspension subject to discharge. (Groves Dep., Appx259:12-22.) For all infractions involving this type

of suspension, employees may request a hearing, known as a 9b hearing, where pertinent facts relating to the suspension are exchanged between USS and the union and addressed.  (BLA, Appx211-212; McCallister Dep., Appx299:25-300:4.)

Following the hearing, the Company affirms, revokes, extends, or modifies the discipline to a discharge, and notice of the decision is sent to the union and employee within five days.  (BLA, Appx212.)  The affected employee can then grieve USS's decision directly to Step 2 of the grievance process, which is held monthly and is followed by a decision affirming or modifying the previous decision.  (*Id.*; Appx208; Marcin Dep., Appx276:17-277:2.)

If the union representative does not accept USS's answer, the USS representative sends Step 2 Minutes, providing a detailed recitation of the facts established at the hearing and the parties' respective positions, which the union representative may then address in writing.  (BLA, Appx208-209.)

Step 3 is started if the union's International Representative appeals the Step 2 decision.  (*Id.*)  Testimony and evidence are again presented during a hearing, outlining the parties' positions, and USS's representative, generally its labor relations manager, renders a final decision within five days of the hearing.  (*Id.*; Marcin Dep., Appx276:17-277:2.)  In doing so, the labor relations manager considers the severity of the violation and the grievant's history of similar violations and discusses the decision with upper management.  (Groves Dep., Appx261:12-18;

Logoyda Dep., Appx284:4-286:23, Appx290:18-290:1; Deposition of Brad Horner ("Horner Dep."), Appx311:25-312:14.)

The decision to issue and uphold the discipline after the Step 2 and Step 3 hearings is ultimately made by USS's labor representative. (McCallister Dep., Appx294:19-295:7, Appx301:2-6, Appx302:13-15.) The International Representative may then appeal the grievance further to a Board of Arbitration. (BLA, Appx209-210.)

### B. Moses's tenure with USS belies any finding that the Company considered his race during the disciplinary process.

#### 1. USS hired Moses in 2005 knowing he is black, and trained him on USS's safety policies, including its Cardinal Rules, to make him successful.

Kenneth Moses, who is black, applied for a position with USS on May 2, 2005. (Appx510-511.) USS's Area Manager, Mark Logoyda, interviewed and hired Moses. (Logoyda Dep., Appx284:4-286:23.)

Not much later, Moses started as a union Snapper in the Blast Furnace at the Edgar Thomson Works in Braddock, Pennsylvania. (Moses Dep., Appx321:1-23, Appx322:17-23.) Logoyda regularly interacted with Moses while at the plant and believed they had a good working relationship. (Logoyda Dep., Appx284:4-286:23.) For years, Moses's employment was largely uneventful, slowly progressing through the union ranks. (Moses Dep., Appx323:11-325:16, Appx326:2-6)

Then in 2013, Moses bid for an Operating Technician 1 — Labor Grade 3 position in the Transportation Department. (Appx88.) Moses was awarded the job, where he was newly responsible for performing the pivotal role of locomotive operator, moving engines and railcars around the property by remote control. (*Id.*)

This was no run-of-the-mill promotion. USS was trusting Moses with a job that carried with it a heavy responsibility: If Moses did not exercise constant vigilance to ensure that USS's safety standards were met, any lapse in concentration, deviation from safety standards, or cutting corners could easily lead to property damage, personal injury, or death. (*See* Pl's Resp. to Req. for Adm. No. 18, Appx344; Horner Dep., Appx315:9-22; Logoyda Dep., Appx287:14-288:9.)

Thus, to prevent these catastrophic possibilities, Moses was regularly trained on USS's policies and safety standards, including its Cardinal Rules and those specific to his job as a locomotive operator. (*See* Def's. Answer to Pl's First Interrog., No. 4, Appx305; Appx92-103; Appx108-131.)

> **2.    Despite USS's efforts to maintain a safe workplace for its employees through regular trainings, Moses committed several workplace safety violations resulting in a Last Chance Agreement mere months before his final safety violation.**

Not long after his transfer to the transportation department, Moses began a downward spiral of safety violations that would ultimately lead to his termination. (Appx230-231.)

First, in July 2013, Moses's supervisor and a black manager saw Moses jump onto a moving locomotive—unquestionably a dangerous move and a textbook violation of USS's Standard Job Procedures (Mounting and Dismounting Railroad Equipment). (*See* Hart's 9b Hearing Notes, Appx223-225; 2013 Incident Report, Appx220-221; Deposition of Amel Brown ("Brown Dep."), Appx348:22-352:1; Deposition of Lauren Hart ("Hart Dep."), Appx361:1-5.)

USS's labor relations representative, Lauren Hart, spoke with the supervisor and suspended Moses for five days subject to discharge for his Cardinal Rule safety violation. (Hart Dep., Appx361:12-17, Appx362:4-10.)

At the 9b hearing challenging his discipline, Moses admitted that he boarded the locomotive while it was moving and that his conduct was unsafe. (Hart's 9b Hearing Notes, Appx223-225; Hart Dep., Appx363:5-12; Moses Dep., Appx333:8-14.)

During the meeting, USS made clear to Moses that reckless behavior of this magnitude would not be tolerated. (Appx225.) The Company also reiterated that safety is the number one core value at USS, and that the Company was concerned about Moses's safety. (*Id.*) Consistent with the seriousness of his misconduct, Moses's suspension was upheld. (Appx230-231.)

In August 2014, Moses was again suspended, this time for failing to bump test his carbon monoxide monitor. (Appx230; Marcin Dep., Appx278:14-279:1; Moses

Dep., Appx327:8-328:2.)   The rules for use of the carbon monoxide monitor, designed to protect employees from toxic gas exposure, require this crucial test before use.  (*Id.*)

Despite USS's consistent dedication to safety and his two safety violations, Moses continued to violate the Company's policies.  (Appx230-231.)

Two months later, in October 2014, Moses climbed up and over the coupler attaching two railroad cars—another Cardinal Rule violation.  (Appx226; Appx216 at RR-03, RR-10; Appx219 at RT-42; Logoyda Dep., Appx287:14-288:9.)   This "life-threatening shortcut" put Moses in significant danger.  (Deposition of Robert Williams ("Williams Dep."), Appx368:15-17; Horner Dep., Appx309:16-310:5; Logoyda Dep., Appx287:14-288:9.)

Moses cut this corner even after management informally counseled him on this exact safety rule prohibiting him from ever climbing over couplers just a few months before.  (Appx226.)[1]  And just like before, Moses admitted to this dangerous violation of safety rules.  (Moses Dep., Appx331:7-333:14.)

For this latest infraction, Moses served another five-day suspension, subject to discharge, which the Company later converted to a Last Chance Agreement.

---

[1]     The term "contacted" in the cited e-mail is interchangeable for "trained" on the workplace rules and protocols for USS employees.  Williams Dep., Appx366:9-367:19 (explaining what happens when employees are contacted on USS's Safe Job Procedures).

(Appx89.)  The Last Chance Agreement, signed on April 22, 2015, detailed that Moses "understands that he must comply with all plant rules and regulations . . . that a failure to comply with all plant rules and regulations will result in suspension subject to discharge." (*Id.*)

That agreement made plain USS's expectations of Moses going forward: He had a final chance to prove that he could follow safety protocols while fulfilling the responsibility of this position.  (*Id.*)

If Moses could not demonstrate a steadfast commitment to safety from then on, it would mean the end of his employment, a term Moses agreed to in returning to work subject to the Last Chance Agreement.  (*Id.*; Moses Dep., Appx335:20-24.)

The agreement further resolved "all outstanding issues" related to the discipline and was a final opportunity for Moses to remain employed.  (Appx89.)

### 3. Despite the ample warnings and repeated chances to fix his dangerous ways, Moses derailed a train while on a Last Chance Agreement that resulted in his termination.

It took only a few months for Moses to prove that he could not meet the requirements of his Last Chance Agreement when he violated yet another Cardinal Rule.  (Logoyda Dep., Appx289:9-22.)

On November 24, 2015, Moses was pulling two railcars with a remote-controlled engine across the plant.  (Appx105-107.)  Moses chose the remote control

from several available units and certified that the equipment was working fine. (Moses Dep., Appx340:1-341:20.)

Later that shift, Moses had to change tracks by bringing the engine with the cars backward through a switch, throwing the switch once the engine and cars were through, and then moving them back through the switch onto another track. (Moses Dep., Appx337:20-338:14.)

As the locomotive operator, Moses had several safety procedures to follow, including always having a clear line of sight in front of the lead car or locomotive, another Cardinal Rule called Head End Protection. (Appx215 at CR-10; Appx218 at RT-12.) But despite all his training and USS's repeated warnings about unsafe behavior, Moses operated the locomotive from a position that left him incapable of providing Head End Protection. (Appx105-107 at ¶ 28; Moses Dep., Appx336:17-21.)

With Moses blind to obstacles on the track ahead, he failed to stop the locomotive from striking a derail device on the track, derailing the train. (Appx105-107 at ¶ 28.) Though Moses knew where the derail device was located, he had to walk from his operating position to realize the train had derailed—the vantage point he should have had while operating the vehicle. (Moses's Derail Statement, Appx237; Moses Dep., Appx336:17-21, Appx337:15-16.) In Moses's words:

> While moving the engine in the reverse direction at a slow
> pace being aware that there is limited room on the foundry

11

> lead I proceeded to apply the brakes and notice [sic] the
> engine not stopping so once it came to a complet[e] stop I
> walked back to see how far it traveled being aware of the
> tight space and notice [sic] the engine had derailed.

(Moses's Derail Statement, Appx237.)

Put differently, this was just the kind of preventable accident USS's safety policies are designed to avoid, and the kind of accident USS had warned Moses about for years. (Appx214-215.)

Upon realizing what he had done, Moses put the locomotive in reverse and began moving the train in the opposite direction. (Appx247; Horner Dep., Appx313:1-20, Appx314:6-23.)

After the shift-supervisor, William "Keith" Martin, learned of the derail, Moses was sent home following a mandatory drug test, customary for all derailments. (Appx105-107; Appx249; Marcin Dep., Appx281:12-21.) Martin prepared a crash report that day, confirming that Moses was not in the proper position while operating the locomotive. (Appx105-107 at ¶ 28.)

The next day, Brad Horner, the Blast Furnace Coordinator, e-mailed Tegan Groves, a USS labor representative, noting that there was no equipment error and that Moses's poor operation led to the accident. (Appx243.) Despite this reasonable conclusion, USS investigated the accident further by obtaining the data recorder to confirm no equipment malfunction. (*Id.*)

USS issued Moses a five-day suspension, subject to discharge, as Martin requested. (Appx91, Appx248.) A 9b disciplinary hearing took place days later where Moses claimed for the first time that his remote-control box malfunctioned and caused the derail. (Appx238-242; Groves Dep., Appx260:13-19.) But the data recorder information confirmed that everything was functioning properly, and that Moses had never applied the brakes like he alleged. (Appx247.) Thus, his termination was affirmed. (*Id.*; Appx90.)

The union grieved the decision, and a Step 2 hearing took place a few weeks later attended by Groves, Horner, Logoyda, and Moses. (Appx227-229.)

During the Step 2 hearing, USS explored Moses's contention that the derailment was not due to operator error, but there was nothing to support this claim and all testing ruled out that possibility. (*Id.*) First, though an air leak was found in the unit that converts signal to air pressure in the locomotive, the air pressure was appropriate. (*Id.*) Next, though oil was discovered in a manifold, the independent brake (the engine brake) would not have been affected by the oil and would not have prevented Moses stopping the train. (*Id.* (referring to Appx243 and citing Horner's November 25, 2015 e-mail); Groves Dep., Appx265:1-10; Appx236; Horner Dep., Appx316:9-318:9.)

13

Instead of equipment error, the facts supported that Moses was not in the proper location when the derailment occurred, and the data recorder showed Moses hit the throttle instead of the brakes.  (Appx229, citing Appx217-218.)

USS determined that Moses's discharge was for cause and noted that:

> It is evident that the Grievant did not comply with RT-01. First the Grievant was not in the proper location when the derailment occurred. According to TRR-17, Head End Protection must be maintained at all times in accordance with the Blast Furnace Rule RT-12 & RT-13. RT-12 specifically states that Head End protection shall be provided in the direction of movement at all times and the operator can accomplish this by (1) preceding the lead car or locomotive on foot or (2) assuming a position which will enable them to see the area ahead of the lead car or locomotive. The Grievant stated that once the locomotive came to a complete stop he walked back to see how far it traveled and noticed the engine had derailed validating that he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive. Clearly if the Grievant was standing in close proximity to the engine he would have seen that he was nearing the derailer and would have attempted to stop. The Grievant also stated that he applied the brakes and noticed that the engine was not stopping however the data recorder indicates that the Grievant never applied the brakes. Even if the Grievant had tried to apply the brake and the brake had failed, he should have engaged or attempted to engage the emergency brake. Lastly, Grievant did not comply with the Stop and Act rule requiring employees to access [sic] the situation, consider alternatives and then take appropriate action including communication with co-workers and supervision. Grievant knew that he derailed and he should have stopped and called his supervisor immediately. However, Grievant throttled up for approximately 40 seconds trying to move forward after

14

> being derailed and the engine was moved 6-8 feet back
> through the derail.

(Appx229.)

Groves prepared the Step 2 Minutes, highlighting the facts established there and explaining why there was no basis for the union's request to overturn the discharge. (*Id.*)

Based on the severity of the infraction, combined with Moses being on a safety-related Last Chance Agreement, the termination was upheld. (Groves Dep., Appx261:12-18.)

A union representative who attended the Step 2 hearing, Adam O'Neil, responded to the Step 2 Minutes with a short letter outlining his take on the derailment, even though he was not there when the train derailed. O'Neil thought that: (1) Moses was 100 feet closer to the derail than Horner viewed on the video and (2) there were issues with other remote-control boxes. (Groves Dep., Appx262:2-264:9; Appx232.)

A Step 3 hearing took place about a month later and was attended by Groves, Horner, Logoyda, and Groves's supervisor, Krista Marcin, on behalf of USS. (Appx233.)

By the time of the Step 3 hearing, third-party experts retained by USS had tested the remote-control box and verified that all equipment was fully functioning. (Appx104.) As for the air leak, it was again noted to be inconsequential because the

investigative tests determined that the air pressure tested satisfactory to keep the equipment functioning.  (Marcin Dep., Appx280:13-24.)

Moses also again admitted that he initially did not know the locomotive derailed, signifying he was not in the proper position to prevent the derail and thus was not providing necessary Head End Protection.  (Marcin Step 3 Meeting Notes, Appx233.)  Instead, he was standing at the switch and had to walk down the tracks to the engine to see it on the ground, aligning with Horner's notes after viewing the derail video, stating "[i]t appears the employee was standing at the switch, approx. [sic] 160 feet from the derailer."  (*Id.*; Appx243.)

Thus, based on Moses's prior safety violations combined with his derail and statements to management during the investigation that were inconsistent with data from the third party showing no equipment failed, none of the Company's representatives—including Logoyda who hired Moses—objected to Moses's termination.  (Logoyda Dep., Appx284:4-286:23, Appx290:18-291:1; Horner Dep., Appx311:25-312:14.)

Brown was not involved in any way with Moses's derail, its investigation, or the subsequent disciplinary process.  In fact, he did not know why Moses had been terminated and postured that Moses was terminated for a prior safety violation not knowing about the derailment at all.  (Brown Dep., Appx347:4-24, Appx357:23-358:2.)

When notified of USS's decision to uphold Moses's termination, the union declined to appeal the outcome and arbitrate the matter—a path it could have taken. (Moses Dep., Appx329:4-21; Appx209-210 (outlining appeal procedure).)

### 4. After the Company upholds his dismissal, Moses claims for the first time his termination was because of his race.

Unhappy with the Company's decision upholding his discharge and the union refusing to appeal it further, Moses filed a Charge of Discrimination against USS with the Equal Employment Opportunity Commission. (Appx370-371.) In it, he claimed—for the first time—that his termination was the product of race discrimination by USS. (*Id.*)

Moses never complained during the grievance process that his discharge was because of racial animus. Even when speaking with Logoyda after the Step 3 meeting, Moses conceded that he "wasn't thinking racially or non-racially" and race "wasn't an issue." (Moses Dep., Appx329:22-330:4.)

Moses filed this lawsuit against USS in May 2020. Moses alleges that he was terminated because of his race in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951 to 963 ("PHRA"), and 42 U.S.C. § 1981.

**C.    At Edgar Thomson Works in Braddock, employees of all races are treated equally, which is demonstrated by USS's reasonable decision to terminate Moses after an investigation confirmed he caused the derailment.**

Black employees at the Edgar Thomson Works were and are treated the same way as employees of other races.  (Deposition of Michael Carter ("Carter Dep."), Appx374:1-375:10.)  USS did not discharge Moses because he is black, but because he committed a serious safety violation while under a Last Chance Agreement, which was the culmination of a series of prior safety violations.  (Horner Dep., Appx311:25-312:14; Logoyda Dep., Appx289:1-25.)

USS conducted a thorough investigation of the November 24, 2015 derail that led to Moses's discharge.   (Horner Dep., Appx311:25-312:14; Logoyda Dep., Appx289:1-25.)  USS could not substantiate Moses's contention that a control box malfunction had occurred.  (Horner Dep., Appx311:17-21; Appx227-229; Appx243; Appx247.)  Instead, and to the contrary, USS's investigation, including internal and external separate reviews of control box data, reasonably suggested to USS that Moses's contentions were contrived and intended to evade responsibility.  (Horner Dep., Appx311:25-312:14; Appx104; Appx243-248.)

In a previous derail of a locomotive that Moses was operating in April 2013, Moses received no discipline because USS determined that the incident was caused by worn wheel flanges.  (Appx221, at Section 5, ¶ 1.)

18

There are no similar non-black co-workers who were not terminated. Of the 25 derailments at the Edgar Thomson Works plant between 2015 and 2016, only one involved an employee who was on a Last Chance Agreement for locomotive-related safety violations—Moses. (Appx139-201; Moses Dep., Appx339:2-7.)

Many derailments were not caused by the operator, and—like with Moses's 2013 derail—these operators were not disciplined for them. (Appx139-201; Def's Suppl. Ans. to Interrog. No. 12, Appx377-378.)

And though Moses tries to claim that he was singled out, three operators who are white were suspended for their roles in the derailments, even though they were not on Last Chance Agreements like Moses. (Brown Dep., Appx353:13-356:6; Def's Suppl. Ans. to Interrog. No. 12, Appx377-378.)

When pressed on why he thought his race impacted his termination, Moses identified only one white operator, Kristopher Smith. (Moses Dep., Appx334:1-6.) But unlike Moses, Smith was not on a Last Chance Agreement because of locomotive-related violations like Moses's. (Appx380-381.) Instead, Smith's Last Chance Agreement existed only because he violated the Company's drug and alcohol usage policy, and before the derail, he had successfully undergone and completed rehabilitation. (Appx380-381.)

Under USS's agreement with the union, employees on Last Chance Agreements for substance use do not violate the Agreement for actions unrelated to

the conduct supporting the Agreement.  In other words, unless Smith violated the same policies that led to his Last Chance Agreement, any later policy violation would be considered separate from those in the Agreement.  (Appx213, Appx202-203.)  Thus, Smith's locomotive derail could not have violated his Agreement because it had nothing to do with conduct that led to the Agreement. (*Id.*)  Moreover, the supervisor who witnessed and reported Smith's incident was not the supervisor who reported Moses' violation.  (Appx605-607 at ¶¶ 30-31.)

Additionally, the circumstances surrounding Smith's derail differ from Moses's.  First, the derail involving Smith was not because he failed to provide Head End Protection like Moses.  Instead, the derail occurred because Smith failed to remove a derail from the tracks while moving the locomotive, a violation of Safe Job Procedure ("SJP") TRR-17.7.4.6 (*Id.* at ¶ 25a; Appx109.)  Moses's failure to provide Head End Protection violated TRR-17.7.4.4, an altogether different rule. (Appx109, 227-229.)

Finally, the severity of the derails differed significantly.  Smith's engine and cars never derailed.  (Appx605-607 at ¶ 17.)  Moses's engine and cars traveled six to eight feet off the tracks, making it a much-more-dangerous occurrence. (Appx227-229, Appx247.)

Despite Moses's claims in his Complaint of a workplace rife with racism, no complaints of race discrimination were made by any employees at the Edgar

Thomson Works facilities from 2010 through 2020 other than Moses's after his termination.  (Def's Interrog. Ans. No. 6, Appx306.)

## II.     RELEVANT PROCEDURAL HISTORY

USS adopts Appellant's Procedural History.  (Appellant's Br. at 17.)

## III.     RULINGS PRESENTED FOR REVIEW

On August 24, 2023, the District Court granted summary judgment in USS's favor.  (Appx4-5.)

Noting that "[a]lthough it is a close call," the District Court concluded that Moses established a *prima facie* case that he was terminated because of his race. (Appx15-17.)    The District Court explained that four of the six disciplinary violations in Moses's last two years of employment at USS were initiated by supervisors Amel Brown and Robert Williams, both of whom Moses alleged made racist remarks in his presence.  (Appx15-16.)  These violations in turn contributed to Moses's termination, which was based in part on his "lengthy disciplinary record." (Appx16.)    The District Court further noted that Moses was disciplined in one instance for failing to promptly fax an engine report, while there was record evidence that such conduct did not typically result in discipline.  (*Id.*)  Finally, the District Court observed that Moses accused Brown of being a "racist" during one of his disciplinary hearings, yet his complaint was not investigated.  (*Id.*)  Viewing all this

evidence in the light most favorable to Moses, the District Court found that he satisfied the *prima facie* standard.  (Appx17.)

Next, the District Court found that USS articulated a legitimate, non-discriminatory reason for Moses's firing—that he derailed a locomotive while on a Last Chance Agreement.  (Appx17.)

In the final *McDonnell Douglas* stage, the District Court found that Moses failed to present evidence sufficient for a reasonable factfinder to conclude that USS's articulated legitimate reason was pretextual.  While Moses attacked USS's conclusion that he failed to provide Head End Protection and was responsible for the derail, the District Court observed that the written decision cited Moses's own account of what occurred—in particular that he had to walk toward the front of the train "to see how far it traveled" and it was only then that he noticed the derail. (Appx18.)  None of the evidence Moses cited rebutted his own written admission. (Appx18-19.)  The District Court also found no support for Moses's allegation that USS knew or should have known that his equipment malfunctioned, noting that USS's decision makers relied on equipment testing conducted by both USS and the manufacturer, all of which showed the equipment to be functional.  (Appx19-20.) Likewise, the District Court found USS's conclusion that Moses tried to move the train after the derail to be well-supported by both video and event-recorder evidence.

(Appx20-22.) For these reasons, Moses's attacks on the termination decision itself were unavailing.

The District Court also considered Moses's assertion that Brown "probably" talked to Groves and thus participated in the termination decision. Noting that there was no record evidence of Brown speaking with Groves, the District Court nonetheless gave Moses the benefit of the doubt on this point, but still concluded that Moses had failed to establish that Brown bore him any racial animus or influenced the other decision-makers and thus failed to show any causal nexus between his race and his termination. (Appx25.)

Turning to evidence of discriminatory animus, the District Court noted that Moses also took issue with his prior discipline, including the July 2013 incident where he was cited for stepping onto a moving locomotive. The District Court found that Moses admitted the conduct in question, concluding that "there is insufficient evidence to support the proposition that Moses's discipline was predicated on his race[.]" (Appx27.) Moses also attacked his discipline for climbing over a coupler, alleging that "another employee" who did the same was not disciplined. But as the District Court observed, "Moses provide[d] no evidence to show that the other employee had a similar disciplinary record when he climbed over the coupler [or] was similarly situated in any way aside from also stepping over a coupler." (Appx27-28.) "On the contrary," the District Court concluded, "the record shows

that Moses admitted that he stepped over the coupler and that doing so was a safety violation." (Appx28.)

Finally, Moses argued that no other employees who caused derails were fired. But as the District Court observed, it is undisputed that none of these other employees were on Last Chance Agreements when their respective derails occurred and were thus not proper comparators. (Appx29.) The District Court also noted that three white employees were disciplined for derails, undercutting Moses's position. (*Id.*) For all these reasons, the District Court concluded that Moses failed to demonstrate that USS's articulated reason for his termination was pretextual. (Appx29-30.)

## SUMMARY OF ARGUMENT

To prevail, Moses must show that his race caused his termination. But he cannot point to *any* employee with a consistent record for serious locomotive-related safety infractions who derailed a locomotive but was not terminated—let alone one who, like him, was already on a Last Chance Agreement for those violations. No other USS employee derailed a train while on a Last Chance Agreement. Thus, Moses can never prove that non-black employees who committed similar infractions were treated more favorably.

It was Moses's responsibility to operate his locomotive safely—he could not delegate this duty to others then and cannot do so after-the-fact now. Though, he

discounts his personal responsibility and instead relies on allegedly faulty equipment, Moses chose the remote-control box that day and certified that it worked without issue at the start of his shift, data recorders show that the equipment operated normally, and neither USS nor the remote's manufacturer could find any defects or malfunctions with the remote after the derailment. Moreover, in the hours following the derail, Moses conceded that he was not in a position where he could provide head end protection to the locomotive as required by USS's safety rules. Thus, USS reasonably concluded that Moses again showed that he could not safely perform his job. Since Moses has not identified any viable comparators and has presented no other evidence to prove that this decision was a cover-up for discrimination, the District Court's grant of summary judgment should be affirmed.

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT MOSES FAILED TO DEMONSTRATE PRETEXT BY PRESENTING EVIDENCE UNDERMINING USS'S LEGITIMATE REASONS

### A.    Standard of review.

This Court "employ[s] a *de novo* standard of review to grants of summary judgment, applying the same standard as the District Court." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016) (internal quotation marks omitted).

Summary judgment is warranted if the court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of a movant's proof[]" will defeat a motion for summary judgment *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

### B. Standard for demonstrating pretext through evidence undermining the employer's articulated legitimate reasons.

"In the context of employment discrimination, PHRA and § 1981 claims are analyzed together, as they are 'governed by essentially the same legal standards.'" *Wolfgramm v. Commc'n Workers of Am. Local 13301*, No. 19-cv-3701, 2022 U.S. Dist. LEXIS 57915, *11 (E.D. Pa. Mar. 30, 2022) (internal quotation marks omitted). The burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to claims of discrimination under both Section 1981 and the

PHRA. *Barnes v. Nationwide Mut Ins. Co.*, 598 F. App'x 96, 89 (3d Cir. 2015). This framework requires Moses to first establish "a *prima facie* case of racial discrimination." *McDonnell Douglas Corp.*, 411 U.S. at 802. If Moses succeeds in establishing a *prima facie* case, "the burden then must shift to [USS] to articulate some legitimate, nondiscriminatory reason for [Moses's] rejection." *Id.* If USS succeeds, then Moses "must prove by a preponderance of the evidence that [USS's] purported legitimate reason is mere pretext." *Barnes*, 598 F. App'x at 89 (citing *McDonnell Douglas Corp.*, 411 U.S. at 804). "While the burden of production may shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bullock v. Child's. Hosp. of Philadelphia*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999) (quoting *Texas Dep't of Cmty' Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

At the final stage of this burden-shifting analysis, "[a] plaintiff may demonstrate pretext by presenting evidence from which a reasonable factfinder could 'either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 319 (M.D. Pa. 2014) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

The question at the first pretext prong is "not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the employment decisions is discrimination." *Bielich v. Johnson & Johnson, Inc.*, 6 F. Supp. 3d 589, 608 (W.D. Pa. 2019).  To discredit USS's proffered reason, Moses cannot simply show that USS was wrong or mistaken in taking an adverse employment action.  *Fuentes*, 32 F.3d at 765.  Rather, "[courts] look only to whether the employer bore a discriminatory animus against the employee and whether this animus manifested itself" in the discharge.  *Hicks v. Arthur*, 878 F. Supp. 737, 740 (E.D. Pa. 1995) (internal citations omitted).  Moses "must show, not merely that [USS]'s proffered reason was wrong, but that it was so plainly wrong that it cannot have been [USS]'s real reason."  *Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 596 (E.D. Pa. 2019).

### C.    Moses admitted in writing that he failed to provide Head End Protection for his locomotive.

In the hours following his November 24, 2015 engine derail, Moses wrote a statement explaining, in relevant part, that

> [w]hile moving the engine in the reverse direction at a slow pace being aware that there is limited room on the foundry lead I proceeded to apply the brakes and notice [sic] the engine not stopping so once it came to a complet[e] stop I walked back to see how far it traveled being aware of the tight space and notice [sic] the engine had derailed.

28

(Moses's Derail Statement, Appx237.)  This statement is conspicuously absent from the discussion in Moses's Opening Brief.   (Appellant's Br. at 1-45.)   Moses's explanation that he had to "walk back" in order "to see how far [the engine] traveled" and only then noticed the derail is a concession that—from where he was standing— he could neither see where the engine traveled nor that it had derailed, meaning that he could not see the area ahead of the engine and thus was not providing Head End Protection as required by USS's safety rules.

Groves reached the same conclusion in her written decision, explaining that, because "[Moses] stated that once the locomotive came to a complete stop he walked back to see how far it traveled and noticed the engine had derailed[,]" "he was not preceding the lead car or locomotive nor was he in a position to see the area ahead of the lead car or locomotive." (Appx229.)  Groves thus concluded that Moses "was not in the proper location when the derailment occurred." (*Id.*)  Based on this objective evidence, USS reasonably determined that Moses was at fault for the derail.

### D. Moses presented no competent evidence that USS's decision makers had reason to believe his equipment malfunctioned.

Following the derail, Horner observed in an e-mail to Groves that his field testing revealed no equipment error and that Moses's poor operation led to the accident.   (Appx243.)   USS's examination of the data recorder confirmed that

everything was functioning properly, and that Moses had never applied the brakes like he alleged.  (Appx247.)

During the subsequent Step 2 hearing, USS explored Moses's contention that the derailment was not caused by operator error, but there was nothing to support this claim and all testing ruled out that possibility.  (Appx227)  First, though an air leak was found in the unit that converts signal to air pressure in the locomotive, the air pressure was appropriate.  (*Id.*)  Next, though oil was discovered in a manifold, the independent brake (the engine brake) would not have been affected by the oil and would not have prevented Moses from stopping the train.  (*Id.*)  Instead of equipment error, the data recorder showed that Moses hit the throttle instead of the brakes.  (Appx229, citing Appx217-218.)  By the time of the Step 3 hearing, third-party experts retained by USS had tested the remote-control box and verified that all equipment was fully functioning.  (Appx104.)

In the face of this evidence of USS's diligent investigation and multiple rounds of equipment testing, Moses offers no proof that USS's decision-makers had reason at the time of their decision to believe that his equipment malfunctioned.  To the contrary, Moses concedes that USS's "investigation of the incident . . . concluded that the equipment worked properly[.]"  (Appx390.)  So long as the decision makers reasonably believed this to be true, any mistake on their part cannot support an inference of discrimination.  *Fuentes*, 32 F.3d at 765 ("the plaintiff cannot

simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"). And as discussed above, the three managers involved in the decision-making process all received investigative reports signifying that the remote control was functional. (Appx243, Appx247, Appx104.)

The District Court also found no support for Moses's allegation that USS knew or should have known that his equipment malfunctioned, noting that USS's decision makers relied on equipment testing conducted by both USS and third parties, all of which showed the equipment to be functional. (Appx19-20.) For these reasons, there is no genuine dispute that USS's decision makers reasonably concluded that Moses's equipment did not malfunction, based on the information available to them at the time of their decision.

### E.    Moses presented no competent evidence to rebut the video and event-recorder evidence showing that he moved his train after the derail.

In a similar vein, Moses disputes that he moved the train following the derail (Appellant's Br. at 16), but the record evidence rebuts his position. The day after the derail, Horner e-mailed Groves and explained that, based on his review of the incident video, the engine began moving in the reverse direction following the derail. (Appx243.) He affirmed this finding during his deposition. (Horner Dep.,

31

Appx313:1-20, Appx314:6-23.)  Further review of the data recorder revealed that Moses "[t]hrottled up for approximately 40 seconds trying to move[] forward after being derailed[.]"  (Appx247.)  And again, third-party testing revealed no malfunction in Moses's equipment. (Appx104.)  For these reasons, USS's decision makers had every reason to believe that Moses tried to re-rail the train himself in the moments following the derail, before he notified his supervisor of the situation.  So long as the decision makers reasonably believed this to be true, any mistake on their part cannot support an inference of discrimination. *Fuentes*, 32 F.3d at 765.

Even more, Moses concedes that USS's "investigation of the incident . . . concluded . . . that he failed to immediately contact his supervisor and instead attempted to re-rail the train himself." (Appx390.)  Moses's admission that USS concluded, at the time of the event, that he attempted to move his train before notifying his supervisor forestalls him from relitigating the issue now.

Likewise, the District Court found USS's conclusion that Moses tried to move the train after the derail to be well-supported by both video and event-recorder evidence. (Appx20-22.)  For these reasons, there is no genuine dispute that USS's decision makers reasonably concluded that Moses attempted to move his train after the derail and before notifying his supervisor.

**F.    Moses admitted that the derailer's flagging played no role in the derail.**

Relying on an after-the-fact expert evaluation, Moses now contends "that the derailer—which lies on the ground close to the tracks, and so is difficult to see— was not properly flagged in accordance with industry standards" and thus that "where [he] was standing was not the root cause of the incident." (Appellant's Br. at 16.) But Moses testified that the lack of a flag made no difference to him: "I knew the derailer was there because of my job. You understand? Like I knew where the derails, where certain switches and things are. You understand? It would have never hit that derailer if the box would have worked correctly. Never hit it." (Moses Dep., Appx337:14-19.)    Likewise, the District Court cited Moses's testimony when disregarding this argument. (Appx22 n.13.) In light of Moses's definitive testimony that he knew where the derailer was, his attempt to relitigate this issue through his expert's report should be disregarded.

**II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT MOSES FAILED TO DEMONSTRATE PRETEXT BY PRESENTING EVIDENCE OF INVIDIOUS DISCRIMINATION**

**A.    Standard of review.**

As noted in Argument Section I.A above, the standard for granting summary judgment is whether the court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. This Court reviews grants of summary judgment *de novo*.

**B.      Standard for demonstrating pretext through evidence of invidious discrimination.**

To establish pretext, Moses can also show that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the USS's action. *Fuentes,* 32 F.3d at 764. Unlike his PHRA claim, Moses must prove "but-for" causation under Section 1981. *Wolfgramm*, 2022 U.S. Dist. LEXIS 57915, at *11. The evidence presented at this stage to establish causation must reflect that (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated individuals more favorably. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015).

**C.      Moses failed to identify any comparators.**

Though "similarly situated" does not mean "identically situated," Moses must prove that he and his comparators are alike in "all relevant respects." *McClung v. Songer Steel Servs., Inc.*, 1 F. Supp. 3d 443, 452 (W.D. Pa. 2014). Thus, to identify proper comparators, Moses must show that he and the other employee had similar seniority, had the same job duties, were subject to the same standards, had the same supervisor, had similar disciplinary histories, and engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct. *Parish v. UPMC Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 628 (W.D. Pa. 2019) (citing *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011));

*Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (finding that comparators must have the same supervisor, be subject to the same standards and have "engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."); *In re. Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (requiring that employees be "similarly situated in all respects" including their "tenure and status" to be comparators); *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (looking to whether the comparator employees "have essentially comparable violation histories"). Whether an individual is "similarly situated" is a "fact-intensive inquiry" to be decided "on a case-by-case basis rather than in a mechanistic and inflexible manner." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004).

Here, Moses has failed to identify any proper comparators. To the contrary, Moses cannot show that he and his proposed comparators are alike in "all relevant respects," in particular their respective disciplinary histories. *McClung*, 1 F. Supp. 3d at 452. Indeed, Moses does not dispute "that he was, at the time, subject to a Last Chance Agreement while others disciplined for their involvement in derailments were not." (Appellant's Br. at 2.) He thus concedes his inability to identify comparators outside his protected class who were treated more-favorably.

Indeed, no other train derailments in 2015 and 2016 were caused by USS employees on Last Chance Agreements for train-related safety violations at all. Moreover, many were caused under different circumstances and involved different supervisors. In particular, none of the derails—other than Moses's—involved an apparent failure to provide Head End Protection. (*Compare* Appx557-559 *with* Appx605-668.) Thus, none of these incidents is suitably comparable.

In sum, Moses cannot identify any viable comparators because no USS locomotive operator, regardless of race, was terminated by the same decision-makers after derailing a locomotive for failure to provide Head End Protection while also on a locomotive-safety-related Last Chance Agreement. The pretext inquiry should end there.

### D.    Moses failed to establish that Brown played any role in USS's decision to terminate him.

Moses also attempts to raise the prospect of invidious discrimination by alleging that Brown participated in the termination decision. But Brown's own testimony undermines this theory, as he stated under oath his belief that Moses was terminated for other reasons—not for the derail. (Brown Dep., Appx357:23-358:2 ("I thought [Moses] was terminated for jumping through the coupler . . . Not a derailment.")) While Moses contends that Brown testified he "probably" talked to Groves about Moses, as the District Court observed, this appears nowhere in the summary-judgment record. (Appx25 ("However, Brown's testimony regarding

'probably' speaking to Groves is absent from the record before the Court.")) For these reasons, there is no competent record evidence that Brown participated in the termination decision, so Moses's argument on this point should be disregarded.

### E.    Even if Brown had played a role in the decision, Moses failed to establish that Brown influenced the other decision-makers.

Assuming for argument's sake that Brown did speak to Groves about Moses, the fact remains that he would have been just one of four managers participating in the decision.  In such a case, Moses bears the burden of showing that Brown influenced his fellow decision makers.  *See, e.g.*, *Parish*, 373 F. Supp. 3d at 631 (citing *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066 (7th Cir. 2003)) (in multiple-decision-maker cases, plaintiffs must "present evidence from which a reasonable jury could infer that [one decision-maker's] prejudicial views influenced their fellow panel members to such a degree that it resulted in their being terminated").  But the record is devoid of such evidence.  While Brown was copied on two e-mails regarding equipment testing (Appx243, Appx247), there is no documentary or testimonial evidence demonstrating his role in the decision or that he influenced the other decision makers.  Again, the burden to develop and present such evidence rests with Moses, *Parish*, 373 F. Supp. 3d at 631, so his failure to do so should end the argument on this point.

The lack of evidence showing Brown's role in the decision also undermines Moses's cat's-paw theory.  (Appellant's Br. at 34-37.)  This Court "allow[s]

plaintiffs to proceed under a cat's paw theory if a supervisor exhibiting discriminatory animus influenced or participated in a decision to take an adverse employment action and if such animus was a proximate cause of the ultimate decision." *Sterrett v. Giant Eagle, Inc.*, 681 Fed. App'x 145, 151 (3d Cir. 2017) (citing *McKenna v. City of Phila.*, 649 F.3d 171, 172, 177-180 (3d Cir. 2011) and *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011)).  Again, the record on appeal is devoid of evidence showing that Brown had any participation or influence in the termination decision.  Even assuming, as the District Court did, that Brown had some level of participation, there is still no evidence that would allow a factfinder to conclude that Brown's alleged animus was a proximate cause of the termination decision.  That would have required Brown to exercise influence over his three fellow decision makers, all of whom were deposed and none of whom testified to any participation or influence by Brown.

### F.    Even if Brown had played a role in the decision, Moses failed to establish that Brown was racially biased against him.

More fundamentally, Brown's purported participation in the termination decision is irrelevant because Moses has not established that Brown was racially biased against him.

To support the idea of Brown's alleged racial bias, Moses cites only a handful of comments.  In fact, his Opening Brief discusses only one alleged comment by Brown—"[If] a black guy can't go get water, what['s] he good for[?]"  (Appellant's

Br. at 7.)   The District Court accurately characterized such statements as "stray remarks" that are not entitled to great weight.   (Appx15.)   Indeed, it is well-established that remarks by non-decision-makers or by decision makers that are unrelated to the decision process are "rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes*, 32 F.3d at 76; *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 359 (3d Cir. 1999) (same); *see, e.g.*, *Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 241 (3d Cir. 2011) (affirming the district court's holding that discriminatory statements made by the defendant's executives when the statements were temporally removed from discharge and unrelated to whether the plaintiff violated company policy lacked probative value); *Walden v. Georgia-Pacific Corp.*, 126 F. 3d 506, 521 (3d Cir. 1997) (when discriminatory statements by non-decision-makers were excluded by the lower court, the Third Circuit held that there was no plain error noting they were mere stray remarks); *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995) (stray remarks do not meet the minimum quantity of evidence needed to avoid judgement as a matter of law); *White v. Aldridge Elec., Inc.*, Civ. No. 5:21-cv-01872,  2022 U.S. Dist. LEXIS 62109, *16 (E.D. Pa. Apr. 4, 2022) (holding that stray remarks that may show a bias must still suggest that the company's justification for terminating the employee is pretext.); *King v. City of New Kensington*, Civ. No. 06-cv-1015, 2008 U.S. Dist. LEXIS 76485, *44-48 (W.D. Pa. Sept. 30, 2008)

(granting summary judgment where the prior discriminatory allegations did not relate to the plaintiff's termination and lacked probative value).

Here, once one excludes Brown's stray comments from the equation, there is no competent record evidence of his alleged racial animus and thus his participation in the decision to terminate Moses is of no moment.

### G.    Moses's attacks on his prior discipline are unavailing.

Our courts wisely refrain from acting as super human resources departments and second-guessing employers' good-faith business decisions. *Frank v. PNC Fin. Servs. Grp., Inc.*, No. 12-cv-34, 2013 WL 4432857, at *8 (W.D. Pa. Aug. 15, 2013) (citations omitted) ("It is not for the Court to sit as a super human resources department and re-examine [the employer's] business decisions."); *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 17 (E.D. Pa.), *aff'd*, 401 F. App'x 697 (3d Cir. 2010) (finding that a fact-finder cannot "act as a super-personnel department over an employer's business judgment" when the employer's decision depended on a "reasonable good faith belief.").  Nonetheless, Moses asks this Court to take on just such a role by reviewing and second-guessing USS's disciplinary decisions going back years prior to his termination.  His arguments on this score should be rejected, both for the improper role they attempt to place upon the Court as well as their lack of substantive merit.

### 1.    Moses admitted to stepping onto a moving locomotive in July 2013.

With regard to the July 2013 incident, the District Court noted that there was some dispute as to whether Moses stepped on or off the locomotive in question, but Moses did not deny that the locomotive was moving at the time. (Appx27.) Since the record showed—and Moses admitted—that stepping on or off a moving locomotive is a safety violation, the District Court found the factual dispute inconsequential and concluded that "there is insufficient evidence to support the proposition that Moses's discipline was predicated on his race[.]" (*Id.*) In the face of this record evidence and his own prior admission, Moses cannot now relitigate the issue on appeal.

It also bears mention that this incident was reported by both Brown and by Pierre Bien-Aime, a black employee, meaning that Brown's report was not a but-for cause of the resulting discipline. (Appx220.)

Moses also argues that supervisors turned a blind eye when white employees stepped on or off of moving locomotives, citing his deposition testimony on the issue. (Appellant's Br. at 11, citing Appx448-449.) But Moses's testimony is devoid of any specifics—there are no names, dates, or other particulars. (*Id.*) While Moses contends that "any issue with the lack of specificity in [his] testimony goes to weight and credibility" (Appellant's Br. at 30), he ignores that the burden to identify comparators is his and—despite the myriad discovery tools at his disposal—

41

he has failed to offer more than his own unspecific, unsupported testimony on this point. Since Moses's unspecific testimony does not give the Court adequate information to assess whether the other employees in question are proper comparators, his argument on this point should be disregarded. *See, e.g.*, *Taylor v. Cherry Hill Bd. of Educ.*, 85 F. App'x. 836, 839 (3d Cir. 2004) ("conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment").

### 2. Moses failed to identify any proper comparators for the June 2014 incident.

Moses also takes issue with the June 2014 incident where he was cited for failed to promptly fax an engine report. While Moses does not contest his underlying conduct, he points to a statement by fellow employee Adam O'Neil that he was not disciplined when he failed to fax in his own reports. (Appellant's Br. at 11-12, citing Appx450-451, Appx571-572.) But O'Neil is not a proper comparator, as Moses has not shown that the two are alike in "all relevant respects," including their seniority, job duties, job standards, disciplinary histories, and differentiating or mitigating circumstances. *McClung*, 1 F. Supp. 3d at 452. For these reasons, Moses has not adequately alleged that his discipline was pretextual in this instance.

### 3.    Moses failed to identify any proper comparators for the August 2014 incident.

Next, Moses raises the August 2014 incident where he was disciplined for failing to bump test his carbon monoxide monitor.  In particular, he cites a declaration by fellow employee Donald Jackson stating that he was not disciplined after forgetting to bump test his monitor "for a period of weeks[.]"  (Appellant's Br. at 12, citing Appx926.)  But Jackson is not a proper comparator, as Moses has not shown that the two are alike in "all relevant respects," including their seniority, job duties, job standards, disciplinary histories, and differentiating or mitigating circumstances.  *McClung*, 1 F. Supp. 3d at 452.  For these reasons, Moses has not adequately alleged that his discipline was pretextual in this instance.

### 4.    Moses admitted to climbing over a coupler in October 2014.

Finally, Moses contests his discipline for climbing over a coupler, alleging that "another employee" who did the same was not disciplined.  But as the District Court observed, "Moses provide[d] no evidence to show that the other employee had a similar disciplinary record when he climbed over the coupler [or] was similarly situated in any way aside from also stepping over a coupler."  (Appx27-28.)  "On the contrary," the District Court concluded, "the record shows that Moses admitted that he stepped over the coupler and that doing so was a safety violation."  (Appx28.)  Nor does Moses attempt to dispute his underlying conduct on appeal, admitting that "Williams sought discipline for Moses after he observed Moses climb over a coupler

connecting two train cars." (Appellant's Br. at 12.)  While Moses continues to cite this unidentified employee as an alleged comparator on appeal (Appellant's Br. at 12, citing Appx453-454, Appx836-837), there remains no evidence of this employee's identity or that he is a similarly-situated comparator.  In fact, "Moses notes that this employee's race is not discernable [sic] in the record."  (Appellant's Br. at 12 n.4.)  At the pretext stage, the burden of production rests with Moses, *Bullock*, 71 F. Supp. 2d at 487, and so the failure to develop this comparator evidence also rests with him.

As the District Court concluded, "[n]othing in the record demonstrates that Moses was unfairly disciplined because of his race when he stepped over the coupler. On the contrary, the record shows that Moses admitted that he stepped over the coupler and that doing so was a safety violation."  (Appx28, citing Appx332 ("I felt the best resource was to go over this coupler to unhook this.  That's how I felt about it.  So when I did that, I did do it."))

### 5.    Moses voluntarily accepted USS's offer of a Last Chance Agreement.

After the October 2014 coupler incident, USS was ready to fire Moses but decided to offer him one more opportunity in the form of a Last Chance Agreement, which he signed and accepted on April 22, 2015.  (Appx89.)  As reflected in this Agreement, Moses "declare[d] that he has read and understands this Agreement, has been given an opportunity to consult with Union representation, and has signed it of

his own free will with the full knowledge of the nature and consequences thereof."
(*Id.*)  Moreover, the Agreement provided that "[t]his is the final opportunity for
[Moses] to become and remain a satisfactory employee.  Failure by [Moses] to abide
by ANY of the terms and conditions of this Agreement shall be considered to be a
material violation of this Agreement and shall result in suspension subject to
discharge."  (*Id.*)

Moses does not—and cannot—contest that his conduct during the November
2015 derail violated his Last Chance Agreement.  Instead, Moses argues that the
Agreement itself is the product of invidious discrimination.  This line of argument
ignores two critical considerations.

First, where an employee's conduct admittedly transgresses a last chance
agreement, courts in this Circuit routinely grant summary judgment in the
employer's favor, as inferential and pretextual attacks must fail under such a fact
pattern.  *See, e.g.*, *Shaw v. Temple Univ.*, No. 16-cv-5567, 357 F. Supp. 3d 461, 479
(E.D. Pa. Jan. 11, 2019) (granting the employer's motion for summary judgment on
the plaintiffs' race discrimination clause because the plaintiffs admitted to violating
their last chance agreements) ("Lastly, and most importantly, Plaintiffs do not refute
that their conduct violated the University's Policies and Last Chance Agreements,
which explicitly provided for their termination. . . . This fact precludes Plaintiffs
from  establishing  that  the  alleged  adverse  action  raises  an  inference  of

discrimination."); *Nicholson v. W. Penn Allegheny Health Sys.*, No. 06-cv-0814, 2007 U.S. Dist. LEXIS 78566 (W.D. Pa. Oct. 22, 2007) (granting summary judgment for employer on the plaintiff's discrimination claims because plaintiff admitted that her employer terminated her for violating a last chance agreement).

Second, last chance agreements like Moses's are the product of the employee's knowing, willful, and voluntary choice, breaking the causal chain between any alleged discrimination that preceded the agreement and everything that comes after. *See, e.g.*, *Golson-El v. Runyon*, 812 F. Supp. 558, 561 (E.D. Pa. 1993) (citations omitted) ("The plaintiff voluntarily entered into the Last Chance Agreement. She understood that there were options other than signing the agreement that were available to her. She decided not to pursue these option [sic], however, and instead she elected to sign the Last Chance Agreement instead. She must abide by its consequences."); *Green v. United States Steel Corp.*, No. 2:05-cv-213, 2006 U.S. Dist. LEXIS 75236, at *15-16 (N.D. Ind. Oct. 12, 2006) (citations omitted) ("Green does not dispute that he voluntarily accepted the terms of his Last Chance Agreement. Thus, any consequences that he may have suffered by virtue of his LCA were solely the result of his voluntary choice, not any adverse employment actions by U.S. Steel.").

For these reasons, the inquiry on appeal should be confined to whether Moses's conduct violated his Last Chance Agreement. Likewise, Moses's attempts

to make causal arguments that reach back to conduct predating his Agreement should be disregarded.

### H. Contrary to Moses's contentions, the District Court did not apply a "pretext plus" standard.

Finally, Moses contends that the District Court erred by holding him to a "pretext plus" standard that has long been rejected by this Court. To the contrary, the District Court carefully hewed to the two pretext prongs outlined by this Court in *Fuentes*. Moses can point to no meaningful deviation from this well-established standard.

Noting that "[a]lthough it is a close call," the District Court concluded that Moses established a *prima facie* case that he was terminated because of his race. (Appx15-17.) The District Court explained that four of the six disciplinary violations in Moses's last two years of employment at USS were initiated by supervisors Brown and Williams, both of whom Moses alleged made racist remarks in his presence. (Appx15-16.) The District Court further noted that Moses was disciplined in one instance for failing to promptly fax an engine report, while there was record evidence that such conduct did not typically result in discipline. (*Id.*) Finally, the District Court observed that Moses accused Brown of being a "racist" during one of his disciplinary hearings, yet his complaint was not investigated. (*Id.*) Viewing all this evidence in the light most favorable to Moses, the District Court found that he satisfied the *prima facie* standard. (Appx17.)

After finding that USS had articulated a legitimate reason for Moses's termination, the District Court moved to the pretext phase and the first prong of the *Fuentes* analysis—whether Moses presented evidence sufficient for a reasonable factfinder to conclude that USS's articulated legitimate reason was pretextual. While Moses attacked USS's conclusion that he failed to provide Head End Protection and was responsible for the derail, the District Court observed that the written decision cited Moses's own account of what occurred—in particular that he had to walk toward the front of the train "to see how far it traveled" and it was only then that he noticed the derail. (Appx18.) None of the evidence Moses cited rebutted his own written admission. (Appx18-19.) The District Court also found no support for Moses's allegation that USS knew or should have known that his equipment malfunctioned, noting that USS's decision makers relied on equipment testing conducted by both USS and the manufacturer, all of which showed the equipment to be functional. (Appx19-20.) Likewise, the District Court found USS's conclusion that Moses tried to move the train after the derail to be well-supported by both video and event-recorder evidence. (Appx20-22.) For these reasons, Moses's attacks on the termination decision itself were unavailing.

The District Court also considered Moses's assertion that Brown "probably" talked to Groves and thus participated in the termination decision. Noting that there was no record evidence of Brown speaking with Groves, the District Court

nonetheless gave Moses the benefit of the doubt on this point, but still concluded that Moses had failed to establish that Brown bore him any racial animus or influenced the other decision-makers and thus failed to show any causal nexus between his race and his termination.  (Appx25.)

Turning to evidence of discriminatory animus, the District Court noted that Moses also took issue with his prior discipline, including the July 2013 incident where he was cited for stepping onto a moving locomotive.  The District Court found that Moses admitted the conduct in question, concluding that "there is insufficient evidence to support the proposition that Moses's discipline was predicated on his race[.]"  (Appx27.)  Moses also attacked his discipline for climbing over a coupler, alleging that "another employee" who did the same was not disciplined.  But as the District Court observed, "Moses provide[d] no evidence to show that the other employee had a similar disciplinary record when he climbed over the coupler [or] was similarly situated in any way aside from also stepping over a coupler." (Appx27-28.)  "On the contrary," the District Court concluded, "the record shows that Moses admitted that he stepped over the coupler and that doing so was a safety violation."  (Appx28.)

Finally, Moses argued that no other employees who caused derails were fired. But as the District Court observed, it is undisputed that none of these other employees were on Last Chance Agreements when their respective derails occurred

and were thus not proper comparators. (Appx29.) The District Court also noted that three white employees were disciplined for derails, undercutting Moses's position. (*Id.*) For all these reasons, the District Court concluded that Moses failed to demonstrate that USS's articulated reason for his termination was pretextual. (Appx29-30.)

While the District Court's focus shifted at various points in this analysis, at no point did it depart from this Court's well-established standards or attempt to require Moses to prove "pretext plus." To the contrary, the District Court considered the entire record at both stages of the analysis. At points, the District Court rejected Moses's testimony as non-probative where it had no record support and contradicted other record evidence, but these instances were grounded in Moses's failure to reach the threshold for competent evidence—they did not constitute an improper weighing of the evidence.

In essence, Moses's argument is that, because the District Court found that he met the *prima facie* threshold, it must have reached the same conclusion when considering his evidence at the pretext stage. But the standards at each *McDonnell Douglas* stage are different, even though the analysis can and often does overlap. Accepting Moses's position would collapse the *McDonnell Douglas* analysis from three stages down to one—a result this Court should rightfully reject.

## **CONCLUSION**

For all these reasons, the District Court's judgment should be affirmed.

Respectfully submitted,

**JACKSON LEWIS P.C.**

Dated: May 6, 2024

*/s/ Marla N. Presley*

Marla N. Presley (PA No. 91020)
marla.presley@jacksonlewis.com
Laura C. Bunting (PA No. 307274)
laura.bunting@jacksonlewis.com
Liberty Center
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
412-232-0404

Daniel F. Thornton (PA No. 318431)
daniel.thornton@jacksonlewis.com
Three Parkway
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
267-319-7802

*Counsel for United States Steel Corporation*

## <u>COMBINED CERTIFICATE OF COMPLIANCE</u>

I certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

I certify that the foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(g) because it contains 11,229 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface—fourteen-point Times New Roman—using Microsoft Word.

Pursuant to L.A.R. 31.1(c), I certify that the text of the foregoing electronic brief is identical to the text in the paper copies filed with the Court.

Pursuant to L.A.R. 31.1(c), I certify that, on May 6, 2024, I caused a virus scan to be run on the foregoing brief using Microsoft Defender version 1000.25992.0.9000 and that no virus was detected.

*/s/ Marla N. Presley*
Marla N. Presley

## CERTIFICATE OF SERVICE

I hereby certify that on the 6TH day of May, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: May 6, 2024                    */s/ Marla N. Presley*
                                                  Marla N. Presley