**No. 23-2605**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

KENNETH MOSES,

*Plaintiff-Appellant*,

v.

UNITED STATES STEEL CORPORATION,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:20-cv-00752-WSS
Hon. William S. Stickman IV

_____

**APPELLANT'S REPLY BRIEF**

_____

Bruce C. Fox
bruce.fox@obermayer.com
Andrew J. Horowitz
andrew.horowitz@obermayer.com
D. McArdle Booker
mcardle.booker@obermayer.com
Obermayer Rebmann Maxwell &
Hippel LLP
525 William Penn Place, Suite 1710
Pittsburgh, PA 15219
Tel:   (412) 566-1500

*Attorneys for Appellant
Kenneth Moses*

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ...................................................... 5, 7

*El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007) ............................................................................ 5

*Lewis v. City of Union City*, 918 F.3d 1213, 1227 (11th Cir. 2019) ......................................... 9, 10

*Parish v. UPMC Univ. Health Ctr. Of Pittsburgh*, 373 F. Supp. 608, 628 (W.D.Pa. 2019) .......... 9

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000) .............................................. 11

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014) .................................................................................... 5

*Wilcher v. Postmaster Gen.*, 441 F.App'x 879, 882 (3d Cir. 2011) ............................................... 9

**USS' Claims That It Acted According To Its Policies Are Belied By The Evidence And At Best Issues of Fact For The Jury, Not An Issue For Summary Judgment**

Appellee's Brief begins with a gratuitous claim that "USS strives to be the world's best steel company." Appellee's Brief, p. 1. This may be true, and at least rhetorically hearkens back to the time when U.S. Steel was the world's largest industrial corporation. This implicit link to a glorious past, however, sits uncomfortably with the central conceit of USS's argument: that time began on November 24, 2015, and neither the District Court nor this Court can consider the actions of USS or its supervisory employees before that date.

While odd on its face, this is a necessary move for USS, because if they grappled with the events prior to the "derailment"[1] for which Mr. Moses was supposedly fired, they would be unable to support the claim that the firing was, as a matter of law, *sui generis* and therefore the similarly situated white employees that received less discipline for worse infractions are, in fact, not similarly situated.

In a sense, this is true. The white employees who received less discipline were not similarly situated in the sense that they had not been subject to the pervasive discrimination that led to the earlier disparate treatment, and so did not have the prior

---

[1] The USS brief makes a great deal of the "derailment," presumably to call to mind the disaster of a fast-moving freight train derailment. This is not that. To the contrary, this was an engine hitting a safety device – a derailer – at a very low speed (but not at as stop, due to an equipment malfunction), and dropping onto the ground, causing the engine to stop. Appx336.

3

record built on discriminatory conduct by USS which USS used as an excuse for the final discriminatory act, Mr. Moses' firing.

It was only by ignoring the evidence of prior discrimination that USS, and the District Court, could reach the conclusion that no reasonable jury could find that USS supervisors who openly stated racist sentiments (see Appx446, 675, 676, 681) and who repeatedly instituted discipline in excess of discipline instituted against white coworkers (Appx448-449, 450-451, 454, 571-572, 576, 836-837, 926; *see* Appellant's Brief pp. 10-13) could have discriminated against Mr. Moses based on race. USS says Mr. Moses was fired, while white workers were not, because he was on a Last Chance Agreement and they were not, and therefore his firing was not a result of racial discrimination. But absent from its Brief is any effort to grapple with the ample evidence that the Last Chance Agreement itself was the result of discrimination based on race.

Similarly, USS states its written policies but fails to meaningfully contend with the evidence that those policies were not enforced against white employees in the same way as they were against Mr. Moses. A supervisor, Amel "Sonny" Brown, who commented, "[If] a black guy can't go get water, what['s] he good for[?]" sought and received a five-day suspension for Mr. Moses, alter increased to ten days, for a claimed safety infraction. Appx675. This is seemingly in keeping with the claim of USS that "safety infractions are always penalized with a five-day

4

suspension subject to discharge." Appellee's Brief, p. 4. That is the policy. The testimony, however, is that this was not the real policy, but to the contrary supervisors "look[ed] the other way" when white workers took the same actions.[2] Appx449.

A year later, the same supervisor, Mr. Brown, who had made the racist comment about fetching water again sought discipline against Mr. Moses, and again for an infraction for which white workers were not similarly disciplined. Appx572. On this occasion Mr. Brown also followed Mr. Moses around as Mr. Moses

---

[2] USS complains that Mr. Moses only offers his own testimony on this point, implying that it therefore lacks credibility (Appellee's Brief p. 42), but its own recitation of the standard of review notes that at the summary judgment stage, the court "refrains from making credibility determinations or weighing the evidence." Appellee's Brief p. 26, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To the contrary:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff]'s competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan v. Cotton*, 572 U.S. 650, 660 (2014). The Appellee's brief goes on to admit, "'[R]eal questions about credibility'… will defeat a motion for summary judgment." *Id.* (quoting *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007)). If the question is one of credibility, as this line of argument seems to imply, then USS has defeated its own position: that question must go to the jury.

complied with the request to correct the infraction, shouting, cursing, and eventually falsely accusing Mr. Moses of threatening him. Appx450-451. Multiple other employees witnessed this, and one described this as an "ongoing problem with Just Kenny Being Harassed" when noting that no one else was disciplined for the same behavior. Appx571-572.

Two months after that, Mr. Moses was again subject to discipline for a claimed safety infraction. Appx454. Another employee, who is white, stated in that case also that he never received discipline for the same infraction, even on occasions where he had been out of compliance for "a number of weeks." Appx926.

In another two months, another supervisor, Robert Williams, who had also made racist comments, stating that he moved to a new neighborhood in order to be around fewer black people (Appx675) also sought discipline against Mr. Moses for a purported safety violation. In this case, it was not the testimony of Mr. Moses, or even of his coworkers, that showed that this discipline was not the impartial and implacable justice USS now claims. It was USS' own incident reports, which showed that another employee engaged in the same conduct and that there is no evidence that employee was disciplined at all. Appx454, 836-837.

Indeed, even for the final incident which USS claims was the reason for Mr. Moses' termination, there were white coworkers treated differently. Three white employees were disciplined for derailments more severe than the derailment which

6

was the pretext for Mr. Moses' termination. Appx558, 643-645. These incidents resulted not in termination, or even the five-day suspension that USS now says are "always" the result of a safety infraction. Instead, for the three white operators they resulted in two three-day suspensions and a one-day suspension that was later dropped.[3] Appx463.

So, the evidence, which USS agrees must be construed in the light most favorable to Mr. Moses (Appellee's Brief p. 26 (citing *Liberty Lobby*, 477 U.S. at 255)), again and again supports, and at the very least would allow a jury to conclude, that Mr. Moses, a black man, was again and again subjected to discipline by

---

[3] USS makes a great deal of the claim that there was no evidence that USS had reason to believe that this incident was the result of an equipment malfunction. Appellee's Brief pp. 29-31. They had Mr. Moses' testimony, however (Appx227), as well as a report from Adam J. O'Neill stating:

> The graph the Company supplied from the data recorder shows that he did in fact apply the brakes: if there as an air leak on the engine how was the air pressure good? Since this incident there has been repeated issues with these remote boxes and now it is standard practice for a failure. You go to hit the break and it throttles up. Since this incident there had been at least fifteen boxes taken out of service for the same issue of hitting the break and it throttling up.
>
> Grievant hit the break and they did not work.

Appx232. USS not only had reason to believe that an equipment malfunction caused the engine to hit the derailer, it knew that the same thing had happened to other operators repeatedly.

supervisors who had made racially charged statements and who did not discipline white workers in the same way, regardless of USS' stated policies.. While credibility is not to be determined at this stage, it is notable that not only Mr. Moses says so: so do his white coworkers and USS' own internal documents. It was the prior disciplinary actions that led Mr. Moses to be forced to accept a Last Chance Agreement, and USS now says that it was the Last Chance Agreement that was the reason he was terminated. Appx474. There is an unbroken line of causation from the first to the final act of disparate treatment, with each earlier instance of disparate treatment being used as a final justification for a disparate termination, both by USS and, eventually, by the District Court. Appx29.

It is in this context that the Court must read USS' claim that there were no similarly situated persons treated differently with regard to Mr. Moses' termination, because no other person was involved with a train derailment while on a Last Chance Agreement. Time cannot begin on November 24, 2015, with the Last Chance Agreement already in place, because the Last Chance Agreement was part and parcel of the disparate treatment that ultimately led to Mr. Moses' discharge.

**USS' Standards For Comparators Would Make It Functionally Impossible To Ever Find Comparators**

As noted above, Mr. Moses identified multiple comparators, all either white or in one case, of unidentified race, who were treated less harshly than he was for each claimed infraction. USS identified no similarly situated employees who were

8

treated as harshly as Mr. Moses in any of these cases. Nonetheless, USS says there were no proper comparators for any of these events. They do this through a fundamental misunderstanding of the law.

USS claims that "to identify proper comparators, Moses must show that he and the other employee had similar seniority, had the same job duties, were subject to the same standards, had the same supervisor, had similar disciplinary histories, and engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct." Appellee's Brief, p. 34. For this principle, USS cites *Parish v. UPMC Univ. Health Ctr. Of Pittsburgh*, 373 F. Supp. 608, 628 (W.D.Pa. 2019). In that case, however, Judge Hornak does not say that all of these things must match, as USS claims.

Instead, *Parish*, quoting this Court, says "'[a] determination of whether employees are similarly situated *takes into account* factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in.'" *Id.*; *Wilcher v. Postmaster Gen.*, 441 F.App'x 879, 882 (3d Cir. 2011) (emphasis added). *Parish* also cites the Eleventh Circuit for the principle that "'[o]rdinarily' a similarly situated comparator 'will have been subject to the same employment policy, guideline, or rule as the plaintiff.'" *Id*. at fn. 120 [brackets in original]; *Lewis v. City of Union City*, 918 F.3d 1213, 1227 (11th Cir. 2019). The *Lewis* Court goes out of its way to note that "[a] plaintiff needn't prove,

9

therefore, that she or her comparators are identical save for their race or gender, as the case may be." *Lewis*, 918 F.3d at 1227.

The courts are clear that USS' proposed standard, in which comparator employees must be the same as the plaintiff in all ways save protected characteristics, is wrong. It is also obviously unworkable. In what case would any employee be able to find another who was exactly the same as them, save race? USS, wishing for Mr. Moses to fail for obvious reasons, reaches into King Eurystheus' bag of tricks and sets him an impossible task.

When it comes time to identify a material difference between Mr. Moses and the many comparators he identifies, USS returns to its strategy of treating November 24, 2015 as the beginning of time. The comparators do not share Mr. Moses' disciplinary history, USS says, but refuses to address how that disciplinary history came to be. The evidence indicates, and a jury certainly could conclude, that the disciplinary history, just like the final act, was created by differential treatment by supervisors openly hostile to black people and Mr. Moses specifically and covered by an obvious pretext. In other words, USS' defense to the claim for differential treatment on the basis of race is its own prior differential treatment on the basis of race.

## USS Is Entitled To Its Interpretation of the Facts, But Ultimately They Must Be Decided By A Jury

USS has advanced its version of the facts below and in its brief here, but when irrelevancies are cut out,[4] it is clear that there are significant questions of material fact remaining for a jury to determine. Mr. Moses rests on the legal arguments in his opening brief, and on the excellent exegesis of the "pretext plus" standard improperly applied by the District Court in the Amicus' Brief. USS, however, is making its argument mostly on the facts, and it claims that the facts establish, and no reasonable jury could conclude otherwise, that it did nothing wrong and, with regard to race, has never done anything wrong.[5] Appellee's Brief p. 18.

This is belied by the evidence that Mr. Moses was treated differently from white employees, including treatment that fellow (white) employees described as

---

[4] Of the irrelevant factual items included in the Appellee's Brief, probably the most galling is the inclusion of the fact that USS required Mr. Moses to take a drug test after the derailment. Appellee's Brief p. 12. Why include this irrelevant item? The only reason can be to try to leave the reader with the impression, in the back of their mind, that Mr. Moses was on drugs. There is no evidence to support that and in fact Mr. Moses was not.

[5] Notably, in support of this claim, USS cites the testimony of Michael Carter, who characterizes Sonny Brown as an "asshole" who is "not that bright, and arrogant" and who "treated a black guy bad and a white guy bad." Appx374-375. Mr. Carter then admits, however, that unlike Mr. Moses, Mr. Carter was never subject to any written discipline as a part of the bad treatment. Appx375. In any case, crediting Mr. Carter's opinion over the evidence of disparate treatment to the point of determining that "no rational trier of fact could have found that petitioner was fired because of his" race, the District Court "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000).

harassment, repeated formal discipline for infractions for which white employees received no discipline or much reduced discipline, and eventually his firing. A jury could find this evidence unconvincing and decide that USS' pretextual reasons were its real reasons. But it is the jury that has the responsibility of making that credibility determination, not the District Court on summary judgment and not this Court now.

    Ken Moses asks that this Honorable Court reverse the entry of Summary Judgment and send this matter to a jury, where it belongs.

Date: June 26, 2024                                   Respectfully Submitted,

                                                  */s/ D. McArdle Booker*
                                                  Bruce C. Fox
                                                  bruce.fox@obermayer.com
                                                  Andrew J. Horowitz
                                                  andrew.horowitz@obermayer.com
                                                  D. McArdle Booker
                                                  mcardle.booker@obermayer.com
                                                  Obermayer Rebmann Maxwell &
                                                  Hippel LLP
                                                  525 William Penn Place, Suite 1710
                                                  Pittsburgh, PA 15219
                                                  Tel: (412) 566-1500

                                                  *Attorneys for Plaintiff-Appellant*
                                                  *Kenneth Moses*

## COMBINED CERTIFICATION OF COMPLIANCE

I, D. McArdle Booker, hereby certify as follows:

1.	I am a member in good standing of the Court of Appeals for the Third Circuit.

2.	The Reply Brief submitted in this matter on behalf of Appellants complies with the type-volume limitation of Rule 32(a)(7)(B)(ii) because it contains fewer than 6,500 words; complies with Rule 32(a)(5) because it uses a 14 point Times New Roman font; and complies with Rule 32(a)(4) because it is double spaced, with required margins on appropriate 8.5 by 11.0 inch paper.

3.	This Brief was electronically filed with the Court on June 26, 2024 and served on counsel of record for all parties via the CM/ECF Filing System.

4.	The electronic version of this Brief is identical to the hard copy of said Brief.

5.	The electronic version of this Brief was checked for computer viruses using Microsoft Defender prior to transmittal.

I hereby certify subject to the penalties of perjury that the foregoing statements made by me are true.

Date: June 26, 2024	　　　　　　　　*/s/ D. McArdle Booker*